**MADISON SQUARE GARDEN BOXING, INC., Plaintiff,**

v.

**Muhammad ALI, Defendant.**

No. 77 C 873.

United States District Court, N. D. Illinois, E. D.

April 29, 1977.

John C. Tucker, Jenner & Block, Chicago, Ill., John A. Guzzetta, Barry R. Ostrager, Dennis G. Jacobs, Simpson, Thacher & Bartlett, New York City, for plaintiff.

Henry L. Mason, III, Charles E. Lomax, Gerald L. Angst, Shalom L. Kohn, Sidley & Austin, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER [1]

CROWLEY, District Judge.

Madison Square Garden Boxing, Inc. (MSGB) brought this action against Mu-

---

1. This memorandum opinion and order shall constitute the court's findings of fact and conclusions of law. Rule 52, Fed.Rules Civil Pro- cedure; *Safeway Stores, Inc. v. Safeway Quality Foods, Inc.,* 433 F.2d 99 (7th Cir. 1970).

hammad Ali (Ali), the heavyweight boxing champion of the world, for breach of contract to fight Duane Bobick (Bobick) in Madison Square Garden. MSGB seeks damages[2] and injunctive relief. The document sued upon was executed on November 25, 1976[3] and called for Ali to fight Bobick on a date during the period from February 1, 1977 through February 28, 1977.[4] Ali defended on essentially four separate grounds: (1) the document sued upon did not constitute a binding contract because Ali lacked the capacity to enter into a contract without the approval of his manager, Herbert Muhammad (Muhammad), (2) there was no breach, (3) MSGB was unable to perform, and (4) if a contract existed it was mutually abandoned.

Ali, as heavyweight champion of the world, successfully defended his championship in September of 1976, in a contest with Ken Norton. That contest was promoted by MSGB and held at Yankee Stadium in New York, New York, pursuant to a Fighters' Agreement executed on May 13, 1976 between MSGB and Ali, not signed by Ali but signed by his manager, Muhammad.

Shortly after the conclusion of that contest, Ali, while in Istanbul, Turkey, held a press conference and, as he had on several past occasions and would again, announced his retirement from boxing.

Teddy Brenner,[5] president and matchmaker of MSGB, continued contracts with Herbert Muhammad (Muhammad) even after Ali's announced retirement. Brenner attempted to find out if Ali was going to box again. He told Muhammad that Ali had been a great champion and had beaten every challenger except Bobick. Brenner told Muhammad that a contest between Ali and Bobick, the current "white hope" would be ideal. Muhammad, having received some criticism that he had been forcing Ali to fight, refused to make any commitment for Ali, but told Brenner that the decision to fight or not to fight was Ali's.

In mid-November of 1976, Brenner was attempting to arrange a contest between Bobick and Norton. Norton's manager was in California, so Brenner and Eddie Futch, Bobick's manager, flew to California to conduct negotiations.

On November 16, 1976, when negotiations for the Norton-Bobick fight reached an impasse, Brenner told Bobick's manager that he thought he could arrange a fight between Ali and Bobick. Futch expressed some skepticism that the fight could be arranged so Brenner placed a call to Muhammad. Futch said to Muhammad "Teddy tells me there is a possibility that Muhammad (Ali) may box again." Muhammad replied, "There is always a possibility." After this call, Brenner told Futch that if Norton-Bobick couldn't be arranged, Brenner would fly to Chicago.

When Norton's manager, Bob Biron, was advised of this development, he also expressed some skepticism, but acting on that catalyst agreed to execute fighters' agreements for a contest between Norton and Bobick to be held in February, 1977. Brenner agreed to execute the agreement on the condition that if an Ali-Bobick contest were arranged, Norton would step aside. It was also agreed that if Bobick won his contest with Ali, Bobick would contract for his first title defense with Norton. On November 17, 1976, all parties executed fighters' agreements for a Norton-Bobick contest.

2. During the course of a two day trial, the Court, on its own motion, separated the issues of liability and damages. Civil Rule 21, United States District Court, Northern District of Illinois.

3. The document was dated November 24, 1976 but was actually signed in the early morning of November 25, 1976.

4. This action was filed on March 16, 1977, after rumors circulated that Ali had agreed to a contest in Seoul, Korea.

5. Brenner has acted as a matchmaker for over thirty years and has promoted thousands of fights.

Brenner then called Muhammad and told him he was coming to Chicago, Illinois.[6] Muhammad agreed to meet him. When Brenner arrived in Chicago, he was picked up at O'Hare Airport by Muhammad's chauffeur and taken to the home of Charles Lomax. Lomax was Muhammad's attorney and held Muhammad's power of attorney.

Lomax said to Brenner, "I have spoken to Herbert. What are you prepared to offer Ali to fight Bobick?" Brenner replied that he would pay $2,225,000.00. Lomax had a telephone conference with Muhammad, and then told Brenner, "Two and a half million dollars and you have yourself a deal."[7] After some discussions of training expenses, and travel they arrived at a figure of $2,500,000.00.

The next morning, Brenner met Lomax in his law offices. Lomax had another telephone conversation with Muhammad.[8] After that conversation, Lomax caused a letter to be prepared for Ali's signature.[9] Throughout the trial this letter was referred to as a letter of intent. There was no claim that it constituted a binding contract.

Brenner, at Muhammad's direction, flew to Houston, Texas, where Ali was working on a movie. They met on November 18, 1976, and Ali said, "We are going to be back in business again." Brenner gave Ali the letter of intent and said, "I have those papers for you to sign that Herbert talked to you about." Ali signed.

Brenner returned to New York and delivered the signed letter of intent to Mike Burke[10] and Arthur McCauley.[11] McCauley, as chief financial officer was concerned with two aspects of the letter: (1) the requirement that the $125,000.00 payment be made on or before November 25, which was Thanksgiving Day and (2) advice of counsel that the letter was not an executed agreement. He did not want to make the payment without an executed contract and did not want the last day for payment to fall on a day when transfer of funds was impossible. Brenner then called Lomax and Lomax told him that the payment on the 25th was no problem, that it could be made the next week.

Brenner, along with Burke and Richard Zahnd[12] then flew to California to make the final arrangements with Biron concerning Norton. Biron, in addition to his prior demand for the first fight with Bobick, also demanded and ultimately received on November 24, 1976, commitments that Norton would fight Ron Lyle as a part of a doubleheader with Ali-Bobick and Norton would be paid $100,000.00 more than he would have received from the Norton-Bobick contest.

Simultaneously negotiations were being conducted with Lyle's representatives, and they agreed to the Norton-Lyle contest. Brenner filled in a form contract and mailed it to Lyle on November 24th. This contract was executed by Lyle and mailed to Madison Square Garden.

Brenner called Muhammad in the late evening hours of November 24 and told him that everything was arranged.[13] Muhammad told Brenner that it wasn't necessary

6. Muhammad's residence, Chicago, is also the residence of Ali. MSGB is a New York corporation, with its principal place of business in New York City. There is no dispute as to diversity of citizenship.

7. Lomax testified that when he cleared matters with Muhammad, he spoke for Muhammad.

8. Due to the illness of members of his family, Muhammad was spending the majority of his time at the hospital.

9. The letter of intent provided *inter alia,* that payment of the $125,000.00 training expense was to be made on or before November 25, 1976, by deposit in an account in the name of Herbert Muhammad at the Northern Trust Company. It also provided that the payment would not be refundable or returned.

10. Burke is president of Madison Square Garden and chairman of MSGB. MSGB is a subsidiary of Madison Square Garden.

11. McCauley is Executive Vice-President in charge of Finance for Madison Square Garden.

12. Legal counsel for Madison Square Garden.

13. Bobick executed his agreement to fight Ali on November 29th.

for him to come to Chicago but that he should go straight to Houston. Muhammad assured Brenner that he would advise Ali that Brenner was coming.[14]

Armed with the document [15] which is the subject matter of this suit, Brenner, in joyful anticipation, flew to Houston and arrived in the early morning of November 25th. He met with Ali and Ali signed the agreement. Exhausted from what one of counsel has called his "Odyssey", Brenner mistakenly inserted the date of November 24th on the agreement.

He then called Muhammad, told him he was in Houston and he was dead tired. Because it was Thanksgiving, Muhammad told him not to come to Chicago, but to return to New York and send Muhammad a copy.

Upon his arrival in New York, he called McCauley and told him of the execution of the agreement.

Unbeknownst to Brenner, another promoter Don King, had arrived in Houston shortly after Brenner left. King secured Ali's signature on an agreement for Ali to fight a man named Schutte, who was the South African champion. Before Ali signed he told King of the agreement with Brenner and that he would fight both Bobick and Schutte. King allegedly penciled in on his agreement a legend that it wasn't valid without Muhammad's signature.

King flew to Chicago and had Lomax come to his law office on Thanksgiving and he and Lomax caused several pages of the Ali-Schutte agreement to be retyped. Lomax then signed the agreement with Muhammad's name.[16] Although Lomax denied having seen or been aware of the details of

the Ali-Bobick agreement until late December, the revised Ali-Schutte agreement was dated November 24, 1976 and it recognized the existence of the Ali-Bobick agreement and its changed payment date of November 29, 1976.

Meanwhile, back in New York, McCauley called [17] Lomax and arranged for the transfer of $125,000.00 in federal funds to Muhammad's account at the Northern Trust Company.

On November 29th, Brenner heard from Lyle's manager that rumors were circulating that Ali would not fight. The next day he saw a newspaper article that indicated that Ali would retire. The publicity director of Madison Square Garden then told him that he had received official word that Ali was not going to fight. Brenner, Burke and McCauley then agreed to announce that the Bobick-Norton fight was going to be held in late February or early March.

Ali, at the request of the Garden's publicity director, telephonically participated in a press conference where he simultaneously announced his retirement and helped to promote the Norton-Bobick contest. Although Brenner has had several conversations with Muhammad and Ali since then, they never talked about boxing. Brenner didn't want to sacrifice a friendship and as far as he was concerned the matter was "over and done with."

However, this complex story did not end here. On or about December 16, 1976, Muhammad wrote to Burke and Brenner and advised them that Ali was prepared to fight Bobick in accordance with the terms of the November 18th letter of intent. He also stated that if MSGB was committed to the Norton-Bobick contest Ali would fight Bo-

---

**14.** This conversation was consistent with Brenner's practice of never discussing business with Ali without Muhammad's approval.

**15.** In anticipation of successful negotiations with Norton, Zahnd had prepared the agreement in New York and Brenner had it with him in California.

**16.** Lomax acting in accordance with his power of attorney, executed documents in Muhammad's name.

**17.** McCauley's recollection was that this call was made on November 26th and that the transfer was made on the same day. However, the records of the Northern Trust Company, in the account set up by Lomax to receive the funds, reflect that the deposit was made November 29th.

bick within four months after that contest. Muhammad stated that if an agreement wasn't signed by December 24th, the payment of the $125,000.00 would be returned. MSGB never responded to this letter, and on January 25, 1977, the $125,000.00 was returned to and accepted by MSGB.

Ali's first contention, that he didn't have the capacity to enter into the agreement without Muhammad's approval is easily resolved.[18]

The document signed on November 25th clearly established a mutuality of obligation and was supported by adequate consideration. Even if it had béen the past practice of Muhammad to execute Ali's contracts, it is clear from the evidence in this case that Muhammad wished this decision to be Ali's and Ali's alone. It is also clear that Muhammad approved of and was aware of all of the contract's provisions.[19] His conduct, in conversations with Brenner, and acts performed on his behalf by Lomax confirmed the agreement.

Similarly, Ali's claim that there was no breach must also fail. When Ali again announced his retirement, it was clearly a stated intention of his refusal to perform and was at least an anticipatory breach of the contract, and MSGB would have had the right to sue for that breach. *Howard v. Daly,* 61 N.Y. 362 (1875); *Davidson v. Odell,* 225 App.Div. 791, 7 N.Y.S.2d 57 (1938).

Since MSGB did not bring an action at that time it is necessary for the Court to examine its conduct to determine if the contract was then mutually rescinded or abandoned. *Williston on Contracts,* 3rd Ed. § 1826.

MSGB, after receiving notice of Ali's then intent to retire, took no action to enforce this contract. On the contrary, the Norton-Bobick contest was reinstated and Ali's aid was solicited and accepted to promote that contest. Brenner felt the matter was "over and done with". This sentiment of Brenner was reinforced by the MSGB's subsequent conduct by accepting the return of the $125,000.00, and its failure to respond to Muhammad's letter of December 16, and its failure to bring this action until after the time for performance expired. Considering all of the circumstances and the conduct of the parties, there was mutual abandonment of the contract. *Rockart v. Mt. Vernon,* 140 Misc. 270, 251 N.Y.S. 514 (1931); *Ave v. Dorsey,* 227 App.Div. 372, 237 N.Y.S. 453 (1929); *Green v. Doniger,* 300 N.Y. 238, 90 N.E.2d 56 (1949); *Brockhurst v. Ryan,* 2 Misc.2d 747, 146 N.Y.S.2d 386 (1955).

Accordingly, the defendant has established his defense of abandonment and judgment shall enter for the defendant and against the plaintiff.

An order shall enter accordingly.

---

**18.** This contention is based in part on a management agreement between Ali and Muhammad. That agreement however did not require that Muhammad sign all contracts.

**19.** If Muhammad and/or Lomax were unaware of its provisions as claimed, there would have been no reason to date the Ali-Schutte agreement November 24th. There would have been no reason or explanation to acknowledge the November 29th payment date for the Ali-Bobick contest in the Ali-Schutte agreement and there would have been no reason to return the $125,000.00 since the November 18th letter of intent called for the payment to be non-refundable whereas the contract contained no such provision.