JERROLD RUSKIN, Plaintiff-Appellee, *v.* JAMES T. RODGERS *et al.*, Defendants-Appellants and Appellees.—(AIMCO, INC., *et al.*, Intervening Plaintiffs-Appellants.)

First District (1st Division)   No. 79-146

Opinion filed December 17, 1979.—Rehearing denied January 14, 1980.

942

James P. Chapman and Merle L. Royce, II, both of Chapman and Royce, Ltd., of Chicago, for appellant and appellee James T. Rodgers.

Gerald G. Saltarelli and Harold C. Wheeler, both of Winston & Strawn, of Chicago, for appellants Aimco, Inc., and Louis F. Allocco.

Epton, Mullin, Segal & Druth, Ltd., of Chicago (Abraham W. Brussell and Gerald B. Mullin, of counsel), for appellee Jerrold Ruskin.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

Jerrold Ruskin (plaintiff), a real estate broker, and James T. Rodgers (defendant), a real estate salesman, entered into a written agreement for joint purchase of a luxury apartment building and its conversion into condominiums. Plaintiff brought an action for specific performance and other relief also joining as party defendants Pelham Corporation and First Wilmette Corporation who were interested as ultimate buyers of the property. The trial court found for plaintiff. Defendant appeals.

Aimco, Inc., a real estate consulting corporation, and Louis F. Allocco, a real estate broker, had filed a petition to intervene as plaintiffs, naming the same parties as defendants. The trial court allowed the petition to intervene but ultimately denied the intervening plaintiffs' claim. Intervening plaintiffs also appeal. Consequently, we have two appeals with different plaintiffs and different factual situations. We will consider each appeal separately beginning with plaintiff's action.

I.

The Issues Between Ruskin (Plaintiff)
And Rodgers (Defendant).

In May 1977, defendant met with Allen Marrinson, executive vice-president of the Upper Avenue National Bank. Marrinson told defendant a luxury apartment building at 1550 North State Parkway was for sale. It was not widely marketed so as to avoid arousing the tenants. The building was owned by Carver Nixon, president of the bank, and Robert Nixon, his brother. Defendant expressed his desire to purchase the building if he could arrange financing. Marrinson said he did not believe defendant could handle such an ambitious undertaking. Marrinson told defendant a $2.2 million offer was pending on the building.

A few weeks later, defendant spoke with Marrinson again and learned the $2.2 million offer had been rejected by the Nixons. Defendant told Marrinson he would pay $2.7 million for the building if he was given a chance to get the money. Marrinson transmitted this information to Carver Nixon. Nixon replied that if defendant could make a firm offer of $2.7 million he would consider it.

Marrinson communicated Nixon's response to defendant. He further told defendant there could be no negotiation of the price. If defendant could not make a $2.7 million offer that would be the end of any dealings with him. Defendant offered Marrinson a $25,000 fee to help him in his negotiations with the Nixons. Marrinson accepted the offer with approval of the board of directors of the bank. Defendant also met with the building owners. They reiterated that the price was $2.7 million and nothing less.

Defendant approached plaintiff in May 1977, and asked him general questions concerning the appropriate procedures for acquiring a rental unit and converting it to condominium ownership. Plaintiff had been engaged in real estate brokerage and development for several years and had developed a number of apartment buildings. In subsequent talks, defendant told plaintiff he had an opportunity to acquire, develop and market a "plum" of a building in the Gold Coast area of Chicago. Defendant asked plaintiff about his ability to fund the purchase of a building. Plaintiff responded that he could do so. Defendant asked plaintiff if plaintiff would be his consultant for a fee. Plaintiff responded he wanted an equity position in such a project.

The parties met again in June 1977. Defendant disclosed the location of the building and explained his development concept in detail. He agreed to give plaintiff 50 percent of any profits received from the project. Defendant explained the conditions imposed by the sellers as to

the firmness of the $2.7 million offer. Plaintiff and defendant verbally agreed to work jointly to acquire and develop the building.

On June 16, 1977, at defendant's suggestion, a memorandum of understanding was prepared by defendant's attorney, Edward Joyce. It provided:

"MEMORANDUM OF UNDERSTANDING

WHEREAS, James Rodgers has been offered the opportunity to purchase and market a building located at 1550 North State Parkway; and

WHEREAS, Jerrold Ruskin wishes to join with James Rodgers in the purchase and marketing of said structure.

NOW, THEREFORE, it is agreed between and among the parties that Messrs. Rodgers and Ruskin will work together and in good faith attempt to purchase the 1550-1540 North State Parkway Building from its present owner, obtain the necessary financing for the conversion of said building to a condominium, arrange for the marketing of said building through James Rodgers and do all else reasonable and necessary to accomplish the above described goals.

IT IS FURTHER AGREED between the parties that the profit derived from the purchase and conversion of the 1550-1540 North State Parkway Building will, after deducting all expenses, be split between Messrs. Rodgers and Ruskin on a 50/50 basis.

For purposes of this Agreement, the term 'expense' shall mean and include any item, whether or not ordinarily considered an expense for accounting or tax purposes, which is paid to a third party, whether or not said third party is a lender or investor.
Dated: June 16, 1977.

_____/signed/_____

James Rodgers

/signed/

_____

Jerrold Ruskin"

Joyce testified that when he first met plaintiff and defendant he (Joyce) stated his understanding that plaintiff was to be responsible for obtaining all the financing. Defendant signed a copy of the agreement as soon as Joyce had prepared it. Plaintiff took a copy signed by defendant and said he would take it to his attorney. Plaintiff testified he signed and returned a copy of the agreement to defendant about June 18. Defendant denied that he had ever received a copy of the agreement from plaintiff. A xerox copy of the agreement reflecting signatures of both parties was received in evidence. There is no provision in this signed copy of the agreement requiring plaintiff to be responsible for financing.

Later in June 1977, plaintiff contacted John Wendlund, a real estate syndicator with whom he had worked before, to inquire if Wendlund would be interested in securing the money needed to purchase the building. Wendlund testified that in July he informed plaintiff he "was prepared to acquire the property for $2.7 million" on a 50/50 partnership basis. Wendlund described this as "a conditional offer." Plaintiff testified that one-half of the profit would go to Wendlund and the remaining half would be divided between plaintiff and defendant. Plaintiff told defendant about this offer without mentioning Wendlund's name. Defendant testified he was not interested in this. He told plaintiff he did not need plaintiff to give away half of the profits. Defendant also contacted other potential investors such as a Mr. Kaufman and a Mr. Fox as possible sources of financing. The parties met with some of these individuals in July, without tangible results.

Plaintiff and Wendlund continued to seek financing for the project despite defendant's unwillingness to split the profits on a 50/50 basis with Wendlund. Plaintiff and Wendlund had a preliminary conversation with the Continental Bank. The bank, while interested in the project, would require several prerequisites to supply financing. Reports of various kinds on the building would be required as well as an earnest money deposit and a purchase agreement. Wendlund told plaintiff that they would have to enter into a partnership agreement before he would put any money into the venture. Defendant testified he had never been advised of Wendlund's participation in the meetings with the bank. However, defendant was aware of plaintiff's contact with the Continental Bank. In fact defendant provided plaintiff with certain information requested by the bank.

On June 23 or 24, plaintiff and Wendlund met with attorney Joel Carlins. They discussed with him a possible purchase agreement for the building and a possible partnership agreement. Carlins was partially selected due to his personal friendship with Marrinson. Carlins and Marrinson are presently law partners. Plaintiff and defendant both testified that the person who had previously offered $2.2 million had made a new offer of $2.45 million on July 11, complete with a check and a written contract. Defendant then agreed with plaintiff to a partnership arrangement with Wendlund. Defendant was anxious to submit an offer for $2.7 million before the expiration of the new offer on July 15, 1977.

Subsequently, during a telephone discussion with plaintiff and Carlins, Wendlund instructed Carlins to contact Marrinson and discuss with him whether a figure lower than $2.7 million would be acceptable. Plaintiff concurred that this "informal" approach would be appropriate. Plaintiff testified he told defendant about what he characterized as this "off the record call." Defendant testified he agreed with plaintiff to use

Carlins but only to negotiate with Marrinson. Defendant stated neither defendant nor plaintiff mentioned any other figure but $2.7 million would be suggested.

Carlins contacted Marrinson on July 15 concerning an offer of $2.5 million. Marrinson responded that such an offer was totally different than what had been agreed upon and he "would not even pass the offer along." He told Carlins "the deal was dead."

Marrinson testified he knew then that plaintiff and defendant were working together. After speaking with Carlins, Marrinson phoned defendant and told him about the conversation. He told defendant that as far as he was concerned the deal with defendant was dead. Defendant became very angry and said that plaintiff had ruined the deal for him. Marrinson also called Carver Nixon who approved of his rejection of the proposed offer.

After receiving the phone call from Marrinson, defendant phoned plaintiff concerning this alleged offer. Plaintiff testified he told defendant that no offer had been made but rather the phone call to Marrinson was an "informal inquiry." Defendant testified he immediately called Marrinson and told him that there had been a misunderstanding. Marrinson responded that there had been no misunderstanding, an offer had been made. Defendant testified Marrinson also told defendant the Nixons would not entertain a contract from plaintiff. Defendant testified he again called plaintiff and told him they were "dead, dead, dead." Defendant stated he had no further conversation with plaintiff for at least 10 days. Defendant said, "I was quite intemperate with him."

On the contrary, plaintiff testified defendant told plaintiff on the phone that defendant was going to see Robert Sheridan to inquire if he wished to buy the building. Sheridan was a real estate developer and vice-president of Pelham Corporation. Plaintiff testified defendant did not tell him on that day that the partnership was terminated. Plaintiff further testified, that after speaking with defendant the second time, he called Wendlund and told him the telephone inquiry had been misinterpreted. Wendlund stated he was prepared to offer $2.7 million for the building but could not get a contract drafted until at least Monday. This information was not communicated to defendant.

Plaintiff testified he called defendant later on July 15, or possibly on July 16, to find out the results of defendant's meeting with Sheridan. Plaintiff further testified defendant said Sheridan had agreed to buy the building for $2.7 million and he and plaintiff would receive 10 percent of the profit. Plaintiff testified he spoke with defendant concerning the Sheridan deal on Friday, on Saturday, on the following Monday or Tuesday and almost every day that week. He testified he discussed with defendant their negotiations with Sheridan. Plaintiff stated he was never

told he was not to participate in the Sheridan deal or that his partnership with defendant was terminated.

Defendant testified he contacted Marrinson on July 15 and asked if he could still be involved in the purchase of the building if he could put the deal together within the 24 hours remaining before the pending offer expired. Marrinson responded he doubted if defendant could get the deal together in the time remaining.

Defendant stated he then contacted Sheridan and told him about the building. Sheridan told defendant he was interested in purchasing it, and they scheduled a meeting for the next day. Sheridan and defendant both testified that defendant originally wished to become a partner in purchase of the property. Sheridan rejected this type of arrangement. At their meeting, defendant and Sheridan entered into an oral agreement. Defendant was to receive 20 percent of the profits and 1 percent of the gross selling price of the units and was to have responsibility for marketing the apartments. Sheridan testified defendant told him he had been working with another individual, but the relationship had been terminated.

Defendant phoned Allen Marrinson and said Mr. Sheridan would buy the building for $2.7 million. Defendant said a cashier's check for $100,000 and a contract would be forthcoming. The contract and check were delivered to the sellers by defendant and attorney Joyce. On Monday, July 18, the sellers executed the contract. The transaction was closed in due course.

Defendant's agreement with Sheridan did not remain as originally negotiated. Apparently differences of opinion developed between defendant and Sheridan. Actually attorney Joyce, acting for defendant, prepared a proposed complaint by defendant which he sent to Sheridan's attorney. The covering letter stated a deadline for a satisfactory arrangement. Ultimately, on September 20, 1977, a written agreement was worked out and executed. It provided that defendant was to have 25 percent of the net profits resulting from the entire transaction with a cash advance of $75,000. Defendant was to have no duties or connection with the marketing of the condominium units. This initial advance was actually paid to defendant. He received $65,000 net after payment of an attorney's fee of $10,000 to Joyce. The history of these changes in their agreement will be discussed later in this opinion as they are relevant to the issue raised by the intervening plaintiffs, Aimco, Inc., and Louis Allocco.

On October 31, 1977, plaintiff filed an action against defendant for specific performance of their written agreement and other relief. Plaintiff joined as defendants herein Pelham Corporation and First Wilmette Corporation, the joint venturers who acquired the property. An amended

complaint was filed January 11, 1978. Essentially, plaintiff sought one-half of the profits realized by defendant as a result of defendant's dealings with Sheridan, an accounting and damages for breach of the alleged partnership agreement. All funds accruing as a result of the Sheridan agreement are being held in escrow by the law firm of D'Ancona, Pflaum, Wyatt & Riskind, subject to further order of court.

On August 25, 1978, plaintiff filed a motion for summary judgment. The motion was denied on November 13, 1978, and the cause was then set for trial on November 29, 1978. On November 27, 1978, defendant's attorney moved for a continuance stating he was unprepared for trial because he had been involved in another case. The trial court denied his motion. On the day of trial, defendant made another motion for a continuance due to his "long depressive illness." This motion was also denied and the trial began. During cross-examination of the first witness, defendant expressed a desire to discharge his attorney. The attorney made an oral motion to withdraw which was denied by the trial court.

On December 22, 1978, the trial court entered a final order granting plaintiff specific performance of the agreement with defendant. In its final order and opinion the trial court found that plaintiff and defendant entered into a valid contract of partnership and that defendant had failed "to give due notice to RUSKIN [plaintiff] of an intent to dissolve same." The trial court ordered Pelham Corporation and First Wilmette Corporation to pay plaintiff one-half of all funds paid to defendant. The trial court denied plaintiff's claims for consequential and exemplary damages.

Defendant contends in his briefs before this court that the trial court erred in holding that a partnership existed between plaintiff and defendant; plaintiff never performed the condition precedent to his joint interest in the opportunity; plaintiff breached his fiduciary duties to defendant which resulted in the mutual abandonment and termination of the agreement; defendant properly rescinded their agreement; the agreement was mutually abandoned; the trial court's denial of defendant's motion for a continuance and substitution of attorneys denied him the opportunity effectively to present his case, and the trial court should have offset a proportionate share of defendant's legal fees for acquiring the partnership interest in the building. We will consider these contentions in their stated order.

## Nature Of The Agreement.

Defendant challenges the existence of a valid partnership contract between himself and plaintiff. It seems clear to us that the legal relationship created by the agreement of June 16, 1977, was a joint

venture and not a partnership. In *Smith v. Metropolitan Sanitary District* (1979), 77 Ill. 2d 313, 317-18, 396 N.E.2d 524, citing *Harmon v. Martin* (1947), 395 Ill. 595, 612, 71 N.E.2d 74, the court held:

" 'A joint adventure is not regarded as identical with a partnership, although, generally speaking, it may be said that practically the only distinction between the two is that the former relates to a single specific enterprise or transaction, while the latter relates to a general business of a particular kind.' "

"[A] joint venture is an association of two or more persons to carry out a single enterprise for profit * * *." (*Smith*, 77 Ill. 2d 313, 318.) Additionally, joint venturers "stand in a fiduciary relationship to each other" and the relationship is governed by the legal principles applicable to partnerships. *Burtell v. First Charter Service Corp.* (1978), 57 Ill. App. 3d 198, 203, 372 N.E.2d 941, *rev'd in part on other grounds* (1979), 76 Ill. 2d 427.

■■ In the instant action, plaintiff and defendant entered into an agreement to purchase a building and convert it to condominiums. This agreement concerned a single transaction or a " 'single project for profit' " and as such was a joint venture. *Baker Farmers Co. v. ASF Corp.* (1975), 28 Ill. App. 3d 393, 395, 328 N.E.2d 369.

In our opinion, plaintiff and defendant intended to create a joint venture. They agreed to "work together and in good faith attempt to purchase the 1550-1540 North State Parkway Building * * *, obtain the necessary financing for the conversion of said building to a condominium, arrange for the marketing of said building" and split "the profit derived from the purchase and conversion." The agreement reveals an intention to effectuate " 'a single project for profit.' " *Baker*, 28 Ill. App. 3d 393, 395.

### Consideration For The Agreement.

Defendant contends the contract was invalid due to a lack of consideration. He asserts that plaintiff did not pledge any time, money, services or skills to the project and that a "joint interest in the mere opportunity to acquire the building was insufficient" to support an enforceable contract.

■■ It is quite unnecessary for a joint venturer personally to provide capital when other contributions are made. In *Ditis v. Ahlvin Construction Co.* (1951), 408 Ill. 416, 419, 97 N.E.2d 244, plaintiff was found to have an interest in real estate pursuant to a joint venture although he was "taken into the company, without investment of capital, as the result of his having conceived and approached Ahlvin with the idea that the company go into the business of building homes for war workers under the authority of the War Production Board."

■ The agreement in the case before us provides the parties will work together to acquire and convert the building. Plaintiff is a real estate broker of substantial experience. Not only did he pledge his best efforts successfully to complete the project but he did, in fact, provide expertise and service. Plaintiff testified he met with prospective investors such as Mr. Fox, Mr. Kaufman, Mr. Wendlund, Continental Bank and other possible sources submitted to him by defendant. Plaintiff prepared documentation necessary to the venture such as a development cost schedule, a real estate tax analysis and maintenance and tax allocations. Clearly, plaintiff's expertise, his willingness to direct his efforts to the project to the exclusion of other possible ventures and the services he performed provide a sufficient consideration.

Moreover, in the instant case, mutual promises to work in good faith to acquire and convert the building were exchanged. "Consideration for a promise is (a) an act other than a promise, or (b) a forbearance, or (c) the creation, modification or destruction of a legal relation or a return promise bargained for and given in exchange for the promise." (*McAdams v. Scullin* (1977), 53 Ill. App. 3d 374, 378-79, 368 N.E.2d 1036.) Here, the mutual exchange of promises was sufficient consideration to render the agreement enforceable.

### Signature Of The Contract.

■ Defendant contends plaintiff failed to establish his acceptance of the agreement because plaintiff did not produce a copy bearing the original signatures of both parties. An original bearing only defendant's signature was produced at trial. A photocopy of the agreement in evidence contained signatures of both parties. Defendant's contention is without merit. In *Amelco Electric Co. v. Arcole Midwest Corp.* (1976), 40 Ill. App. 3d 118, 124, 351 N.E.2d 349, the court held:

> " 'Where a party accepts or acts upon a contract in writing, it is effective as to him even though he does not sign it.' "

### Condition Precedent.

■ Defendant contends that as a condition precedent to plaintiff's joint interest in the venture, plaintiff was to obtain financing for purchase of the building. In *In re Estate of Albrecht* (1975), 27 Ill. App. 3d 839, 841, 327 N.E.2d 317, the court held:

> "A condition precedent is one which must be performed before a contract becomes effective or which is to be performed by one party to an existing contract before the other party is obligated to perform."

A careful reading of the agreement does not reveal the existence of any condition precedent. It is fundamental that prior conversations of the

parties are all merged into their written agreement. *Kendall v. Kendall* (1978), 71 Ill. 2d 374, 377-78, 375 N.E.2d 1280.

## Extrinsic Evidence.

Defendant argues, however, that the agreement is vague and ambiguous and extrinsic evidence should be used to interpret it. In *La Throp v. Bell Federal Savings & Loan Association* (1977), 68 Ill. 2d 375, 384, 370 N.E.2d 188, the supreme court held:

> "When the terms of a contract are plain, the instrument itself is the only source of intent of the parties. [Citation.] However, where there is an ambiguity arising from the terms of the contract, the meaning may be derived from extrinsic facts surrounding the formation of the contract."

■■ Whether an agreement is to be classified as ambiguous is a question of law. (*Touhy v. Twentieth Century-Fox Film Corp.* (1979), 69 Ill. App. 3d 508, 513, 387 N.E.2d 862.) We find the agreement before us clear and unambiguous in creation of a joint venture without condition precedent. It is neither necessary nor proper to use extrinsic evidence to determine its meaning. *Stevenson v. ITT Harper, Inc.* (1977), 51 Ill. App. 3d 568, 573, 366 N.E.2d 561, *appeal denied* (1977), 66 Ill. 2d 642, and cases there cited.

## Breach Of Fiduciary Duty; Rescission By Defendant And Mutual Abandonment Of The Agreement.

Defendant contends plaintiff breached a fiduciary duty which plaintiff owed defendant. Defendant claims this breach gave him clear right to rescind the agreement which he accomplished by notice to plaintiff. It is correct, as above shown, that joint venturers are in a fiduciary relationship to each other. It is defendant's theory that plaintiff failed to disclose his dealings with Wendlund and that plaintiff and Wendlund thus attempted to overreach defendant and acquire the property without him. As above shown, according to defendant's testimony, plaintiff authorized attorney Carlins to convey an offer of $2.5 million for the property to Marrinson in defiance of the understanding with the owners.

Defendant's problem with this theory is factual. Defendant contends he had no knowledge of the Wendlund dealings. On the contrary, plaintiff testified that defendant was informed of the Wendlund situation. Plaintiff also testified that the so-called offer of $2.5 million was actually an informal inquiry in the nature of an exploration.

Defendant urges that he accomplished a rescission of the written

agreement when he talked to plaintiff and told him that "the deal" was dead. Here also the problem is factual. Plaintiff testified he was never informed by defendant that their agreement had been terminated. Plaintiff's testimony denies conversation with defendant concerning rescission. Plaintiff detailed a number of conversations between the parties, after the purported conversation relied upon by defendant as a rescission, in which defendant advised plaintiff of the status of the dealings with Sheridan and assured plaintiff that the arrangements were going forward so that the two parties could share in the profits.

Similarly, on the issue of mutual abandonment, defendant cites cases to the effect that abandonment need not be expressed in definite language but may be inferred from surrounding circumstances and the conduct of the parties. *Madison Square Garden Boxing, Inc. v. Ali* (N.D. Ill. 1977), 430 F. Supp. 679.

Here once more there is a factual problem. Defendant urges that plaintiff and Wendlund sat back and decided not to submit an offer and that plaintiff never told the sellers of the property that an offer of $2.7 million would be made. Quite to the contrary, plaintiff testified that he had been in touch with defendant and that defendant told him of progress being made in connection with the proposed Sheridan transaction. Plaintiff's position therefore is that he depended upon defendant in accordance with defendant's own statements concerning the possibility of consummation of the Sheridan transaction.

In each and all of these factual matters we find a complete dichotomy in the testimony of the parties and other witnesses. The factual issues therefore resolve themselves into questions of credibility which were within the province of the trial court to resolve. Here the ancient rule applies that the trial judge was in the best position to weigh the evidence and observe the demeanor of the witnesses. "[T]he fundamental rule applies that the findings of a trier of fact will not be overturned unless contrary to the manifest weight of the evidence." *Stuart v. Continental Illinois National Bank & Trust Co.* (1977), 68 Ill. 2d 502, 532, 369 N.E.2d 1262.

In the case before us these issues of rescission or mutual abandonment of the written agreement between the parties were matters of affirmative defense. The burden of proof rested upon defendant to prove these defenses by a preponderance of the evidence. In dealing with rescission because of mutual mistake the Illinois cases use the language that "[t]o warrant a rescission the evidence must be clear and positive." (*Winkelman v. Erwin* (1929), 333 Ill. 636, 640, 165 N.E. 205. See also *Smuk v. Hryniewiecki* (1938), 369 Ill. 546, 555, 17 N.E.2d 223; *Wil-Fred's, Inc. v. Metropolitan Sanitary District* (1978), 57 Ill. App. 3d 16, 21, 372 N.E.2d

946, *appeal denied* (1978), 71 Ill. 2d 606, and *People ex rel. Department of Public Works & Buildings v. South East National Bank* (1971), 131 Ill. App. 2d 238, 241, 266 N.E.2d 778.

◼ Upon the entire voluminous record before us, we conclude that there was no fiduciary breach of the agreement by plaintiff; there was no rescission of the contract by defendant and there was never a mutual abandonment of the agreement by the parties hereto.

## Motions For Continuance And Substitution Of Attorneys.

Defendant contends he was deprived of a fair trial because of denial by the trial court of defendant's motions for continuance and substitution of attorneys. As above shown, defendant requested a continuance on November 27, 1978, two days before the previously set trial date.

In matters of this kind, the trial court "possesses broad discretion in allowing or denying a motion for continuance." (*Tamimie v. City of Galesburg* (1977), 50 Ill. App. 3d 843, 844-45, 365 N.E.2d 1177, *appeal denied* (1977), 66 Ill. 2d 642; see also Ill. Rev. Stat. 1977, ch. 110, par. 59.) Denial of such a motion "will not be disturbed on appeal unless there has been a manifest abuse of discretion or a palpable injustice." (*Needy v. Sparks* (1977), 51 Ill. App. 3d 350, 358, 366 N.E.2d 327, *appeal denied* (1977), 66 Ill. 2d 639, citing *Continental Illinois National Bank & Trust Co. v. Eastern Illinois Water Co.* (1975), 31 Ill. App. 3d 148, 334 N.E.2d 96.) Furthermore, "[b]ecause of the potential inconvenience to the parties, witnesses, and the court, especially grave reasons for granting a continuance must be given once a case has reached the trial stage." *Needy*, 51 Ill. App. 3d 350, 358, citing *Schneider v. Seibutis* (1972), 3 Ill. App. 3d 323, 279 N.E.2d 37; see also Ill. Rev. Stat. 1977, ch. 110A, par. 231(f).

◼ In the case before us, the trial court denied a motion two days before trial. We cannot say the trial court manifestly abused its discretion or that its action resulted in a "palpable injustice." (*Needy*, 51 Ill. App. 3d 350, 358.) The record does not reflect any lack of preparation by any of the able counsel in the trial court.

Defendant further contends the trial court erred in denying the motion for substitution of attorneys during the course of trial. Defendant contends that an individual has an absolute right to replace his attorney at any time with or without cause. However, as stated in *Filko v. Filko* (1970), 127 Ill. App. 2d 10, 16-17, 262 N.E.2d 88:

> "The cases in this State, however, do indicate that the right to substitute counsel is not an absolute right. * * * A trial judge has discretion in allowing substitution, and if substitution of counsel would unduly prejudice the other party or interfere with the administration of justice, the decision of the trial judge in refusing

to allow such substitution should be upheld unless there is an abuse of such discretion."

See also *People v. Franklin* (1953), 415 Ill. 514, 516-17, 114 N.E.2d 661.

■■ In the case before us, defendant attempted to discharge his attorney during the course of the trial. The attorney was at that time cross-examining the first witness. To allow defendant to substitute attorneys at this point would have been extremely disruptive to the trial and would have resulted in a significant and prejudicial delay. This is particularly true where, as here, the impetus behind the discharge of the attorney appeared to be predicated upon emotional whim rather than upon any apparent sound reason.

The cases cited by defendant in support of the proposition that a client has an absolute right to discharge his attorney at all times are readily distinguishable. Defendant cites *Warner v. Basten* (1969), 118 Ill. App. 2d 419, 255 N.E.2d 72, and *County of Cook v. Schroeder* (1965), 55 Ill. App. 2d 449, 205 N.E.2d 257. *Warner* deals with the right of a client to dismiss his attorney regardless of the existence of a fee arrangement. *Cook County* concerns the right of a client to revoke the ordinary authority possessed by his attorney. Neither case goes to the issue of substitution of attorneys during the course of a trial. We find no error in this regard.

On the entire record, therefore, we affirm the result reached by the trial court in concluding that plaintiff and defendant should share equally in the profits resulting from the transaction here involved.

## II.
### The Issues Between Aimco, Inc., And Allocco With Reference To Their Claim Against Rodgers (Defendant).

We turn now to a determination of the rights of the intervening plaintiffs Aimco, Inc., a corporation, (Aimco), and Louis F. Allocco (Allocco) against James T. Rodgers (defendant). In deciding this matter the trial court found that these parties had previously worked together for the sale of individual condominiums. However, the trial court also found "it was never the intention of AIMCO, ALLOCCO or RODGERS to expand their agreement to embrace or include a transaction such as * * *" involved in the instant case. The trial court accordingly dismissed the intervening complaint of Aimco and Allocco. An additional statement of facts is required.

Aimco is in the real estate consulting business. Allocco is its president. Allocco, is and has been for some years, a licensed real estate broker. (See Ill. Rev. Stat. 1977, ch. 111, par. 5706(a).) During the time material hereto, defendant was a licensed real estate salesman. See Ill. Rev. Stat. 1977, ch. 111, par. 5707(a).

Early in February 1977, defendant and Allocco agreed orally that defendant would work as a salesman for Aimco. All commissions earned by defendant were to be paid to Aimco and divided five-sixths to defendant and one-sixth to Aimco. Defendant was to pay his own expenses. In accordance with this understanding, and pursuant to the statute (Ill. Rev. Stat. 1977, ch. 111, par 5727(e)), defendant directed the Department of Registration and Education to transfer his salesman's license to "AIMCO, INC. (LOUIS F. ALLOCCO)." This situation remained in effect until January 1978. Defendant engaged in a number of transactions involving sale of residential condominiums and his brokerage commissions were handled in accordance with the verbal agreement.

The facts regarding the relationship between plaintiff and defendant and their efforts in attempting to purchase the property here involved have been stated above. It appears that about July 14, 1977, defendant spoke to Robert Sheridan, a vice-president of Pelham Corporation which ultimately acquired the property in question. Defendant told Sheridan about the building. They met the next day. Sheridan testified that defendant told him a previously interested party had failed to develop the necessary financing. Sheridan stated he had no previous knowledge concerning the possibility of buying the building. Sheridan agreed that he would try to buy the building for the stated price of $2.7 million.

At that time Sheridan and defendant reached a verbal agreement. Sheridan refused to permit defendant to have an equity or ownership interest in the transaction. Sheridan and defendant then verbally agreed that defendant was to be in charge of selling the condominium units after acquisition of the property. Defendant was to receive a 20-percent interest in all capital and profits of the transaction with an advance of $37,500 and also 1 percent of the gross selling price of all of the condominium units.

The consummation of the transaction then proceeded as above described. Before the transaction was closed, the attorney for the sellers requested that defendant sign a letter in which he released the sellers from all claims for commission. Defendant signed this letter. He did not inform Allocco or Aimco on this matter. Defendant testified that he knew he would be paid for his efforts by the Sheridan group. The contract between the seller and the Sheridan group also provided that the Sheridan venture, as buyers, indemnify the seller with reference to all brokerage commissions arising from the transaction.

Shortly before the closing of the transaction defendant and his attorney, Edward T. Joyce, tendered a one-page agreement to Sheridan. This provided that defendant was to receive a "20% interest in the capital and profits of the venture * * *" together with a cash advance of $37,500 and also 1 percent of the net selling price of all condominium units. The

agreement was never signed. Sheridan testified he did not sign because of an additional provision to the effect that defendant would be in charge of structuring and implementing the marketing of the condominium units.

About at this time the attorneys for the Sheridan group also prepared a lengthy joint-venture agreement which included defendant as a member. This agreement showed defendant was to contribute $2500 to the capital of the venture. An individual capital account was to be maintained for each party. Defendant was to have a share in all profits of 7.69 percent and was to pay 20 percent of all losses.

A second draft agreement, also prepared by attorneys for the Sheridan group, provided that it was to state the understanding of all parties including defendant for compensation due defendant for his services in acquiring the property and marketing the condominiums. The agreement is lengthy and detailed with reference to steps to be taken concerning the marketing of the units. This agreement also provided for an advance of $37,500 to defendant, payment to him of 20 percent of all net profits and also 1 percent of the selling price of the condominiums. These agreements were never executed.

As time went on various disagreements arose between Sheridan and defendant. This situation became augmented to the extent that defendant's attorney prepared a suit for filing against the Sheridan group for appointment of a receiver for the property. After further dealings the situation was resolved on September 20, 1977. A written agreement was executed between defendant and the Sheridan group. This agreement recites that defendant had advanced certain claims against the group including his rights to an acquisition fee, a share of profits in sale of the units, and various other matters. The agreement provides that defendant personally should assume all liability for payment of an acquisition fee of $25,000 to Allan J. Marrinson. Defendant gave a complete and general release of all claims to the Sheridan group. In consideration thereof the group agreed to pay defendant 25 percent of the net profits received from sale of the condominiums. The net profits were to be determined with due consideration to the cost of acquiring the property and the conversion thereof. Defendant was to receive $75,000 as an advance on the net profits. In addition defendant was to have no participation of any kind in marketing the condominium units. Sheridan testified this agreement was negotiated with defendant so that defendant would have no further connection with the property.

During this time Allocco was not informed of the interest of defendant in the transaction. In December of 1977 he spoke to defendant and inquired about commission resulting from the matter. Defendant responded he had no commission coming from the transaction because he had waived it.

In this court Aimco and Allocco contend the trial court should have found that defendant performed brokerage services in sale of the property so that the compensation due defendant is a brokerage commission; the trial court erred in holding that the transaction was outside the scope of the agreement between defendant and Allocco and Aimco; and Aimco and Allocco are entitled to one-sixth of the entire amount which would be paid to defendant.

Defendant contends that Aimco and Allocco have presented no evidence of fraud; they cannot recover brokerage commissions in the absence of an express or implied engagement between them and the sellers or buyers of the property; and they cannot recover from defendant in the absence of a written contract. In addition defendant urges that the evidence shows defendant and Sheridan jointly attempted to acquire the property so that defendant performed no brokerage services; the agreement between defendant and Aimco is vague and indefinite and therefore unenforceable; the trial court properly concluded the transaction was outside the scope of the agreement between defendant and Aimco; and Aimco and Allocco may not maintain the action because Aimco was not a registered broker.

We agree with counsel for defendant that no issue of fraud is pertinent here. The record shows no proof by clear and convincing evidence of the elements of fraud as defined by the courts of Illinois. (*Broberg v. Mann* (1965), 66 Ill. App. 2d 134, 139, 213 N.E.2d 89.) In our opinion the crucial point upon which the rights of these parties depend is the precise nature of the relationship between defendant and the Sheridan group. If defendant acted as a broker under applicable law in his dealings with the Sheridan group and actually received a brokerage commission as his compensation, it would follow necessarily that defendant would be obliged to share the commission with Aimco and Allocco in accordance with their admitted verbal agreement.

■■ There are at least two possibilities regarding the legal nature of the relationship between the Sheridan group and defendant. Their relation could have been that of broker and principal or of finder and principal. If the relationship of broker and principal was present, the compensation of defendant as a broker could have been measured as a percentage commission of the selling price of the property or by any other agreed yardstick such as a percentage of profits. As counsel for Aimco and Allocco point out, a commission paid to a broker may take divers forms and may consist of an assignment of a note (*Webster v. Hochberg* (1969), 105 Ill. App. 2d 466, 475, 245 N.E.2d 529, *appeal denied* (1969), 40 Ill. 2d 581); payment of a flat amount by the purchaser (*Lustig v. Robin* (1972), 6 Ill. App. 3d 126, 285 N.E.2d 165; *Thorp v. Gosselin Hotel Co.* (1965), 65 Ill. App. 2d 107, 212 N.E.2d 1) and even by delivery to the broker of stock

in the purchasing corporation (*O'Connor v. Sullivan* (1973), 12 Ill. App. 3d 860, 299 N.E.2d 451).

Aimco and Allocco urge strongly that the decision of this court in *Anderson v. Gewecke* (1976), 36 Ill. App. 3d 170, 343 N.E.2d 673, is directly in point. We do not agree. Anderson did not involve a broker's commission. That case deals with the issue of allowance of a finder's fee upon a quasi-contractual basis. The opinion shows that plaintiff Anderson was a real estate broker but it does not appeal that his two partners Lauer and R. J. Anderson, Inc., a corporation, were brokers. (*Anderson*, 36 Ill. App. 3d 170, 171.) Gewecke requested Anderson to find a piece of vacant property in Arizona suitable for development. Anderson did so. Anderson tendered to Gewecke a proposed agreement for limited partnership. The three plaintiffs were designated as general partners with provision for additional limited partners. Anderson negotiated at some length with Gewecke's group. The latter wished also to become general partners. Anderson refused. One of Gewecke's associates ascertained the location of the land, and shortly thereafter the Gewecke group purchased the land behind the back of Anderson and his partners.

In *Anderson*, both the Anderson and the Gewecke groups wished to obtain an equity position in the property. As we pointed out in *Anderson*, the "distinction between a finder and a broker is that the former has no duties to perform in connection with negotiating the contract." (*Anderson*, 36 Ill. App. 3d 170, 175.) It appeared in *Anderson*, that the services rendered by Anderson and his partners were simply that of locating the property and presenting it to Gewecke and his people. Under these circumstances, this court reached the conclusion that valuable services were rendered by plaintiffs as finders and, even in the absence of an express oral agreement for compensation, plaintiffs were entitled to recover an equitable amount.

It seems to us that the instant case could possibly be factually similar in the relationship between plaintiff and defendant if plaintiff had marketed the property without the knowledge of the defendant. However, the principle followed in *Anderson*, regarding the basic difference between a broker and a finder is applicable to the instant case. The record before us shows that plaintiff and defendant were not interested in acting as brokers in selling the property. From the inception of the transaction, plaintiff and defendant sought only to become part owners of the building. Their objective was not a brokerage commission. Their intention always was to obtain an equity position in the property. Aimco and Allocco concede, as they should, that defendant had always schemed to acquire the property as a principal. Similarly, when plaintiff sought to market the property through Wendlund, plaintiff was only interested in an equity position in the real estate.

■■ Defendant acted strictly and only as a finder when he brought the matter to Sheridan. It is clear and definite that throughout defendant's contacts with Sheridan, defendant was interested only in obtaining an equity in the property in exchange for the services which he rendered in first finding the property and then bringing it to Sheridan. It is clear from the record that Sheridan did not wish defendant to have an equity position. Sheridan wished to compensate defendant for services in bringing him notice of the property. Although defendant tendered an agreement to Sheridan, which gave defendant a capital interest in the venture, and the attorneys for Sheridan prepared two separate joint venture agreements which would have a similar result, none of these agreements was executed. The final agreement between Sheridan and defendant cut off and negated any claim which defendant may have had to an equity position and provided instead that he would have a share in the profits as compensation for his services thus rendered to the Sheridan group.

The Illinois cases evidence the distinction between services rendered by the broker and the finder. In *Modern Tackle Co. v. Bradley Industries, Inc.* (1973), 11 Ill. App. 3d 502, 507, 297 N.E.2d 688, this court pointed out that the finder is not required "to perform the duties of the broker in negotiating the contract." This same principle was stated in *Anderson,* 36 Ill. App. 3d 170, 175, and in *Kilbane v. Collins* (1978), 56 Ill. App. 3d 707, 711, 372 N.E.2d 415, *appeal denied* (1978), 71 Ill. 2d 603. *Kilbane* cites the pertinent statutory definition of a real estate broker as " 'any person, * * * who for a compensation * * * *negotiates* the purchase or sale or exchange of real estate * * *.' (Emphasis added.) (Ill. Rev. Stat. 1965, ch. 114½, par. 2)." *Kilbane,* 56 Ill. App. 3d 707, 711.

An annotation frequently cited to this proposition defines the services of a finder as (Annot., 24 A.L.R.3d 1160, 1164 (1969)):

"[A] arrangement by which an intermediary finds, introduces, and brings together parties to a business opportunity, leaving the ultimate negotiation and consummation of the business transaction to the principals."

Another helpful authority here is *Hennessy v. Schmidt* (7th Cir. 1975), 521 F.2d 1282. There, the court of appeals reversed denial of a finder's fee. The court pointed out that the District Court erred in depending upon "the classical real estate broker's test of performance * * *" (*Hennessy,* 521 F.2d 1282, 1285). The court of appeals also held that the appropriate test to be applied was whether the finder was the proximate cause of the procurement of the sale. The court of appeals cited *Modern Tackle Co.* and a number of earlier decisions of this court. *Hennessy,* 521 F.2d 1282, 1286.

In addition, we find a thorough opinion by the late Justice Hallett in which he cited a number of authorities from Illinois and other jurisdictions to the effect that (*Kilbane v. Dyas* (1975), 33 Ill. App. 3d 439, 440, 337 N.E.2d 217):

> "[S]ome, but not all, courts have recognized a distinction between finders and real estate brokers, defining a finder as an intermediary who contracts to find and bring the parties together but leaves the negotiation of the ultimate transaction to the principals."

In *Kilbane v. Dyas*, an unlicensed person attempted to collect a commission. The court held plaintiff could not recover because he swore in his verified complaint that he sought compensation for " 'services rendered in negotiation of a lease \* \* \*.' " *Kilbane*, 33 Ill. App. 3d 439. ▪▪ The next pertinent inquiry is what precisely were the services thus rendered by defendant? Beyond bringing the transaction to the attention of Sheridan, defendant did nothing. The delivery of the purchase contract and the check for earnest money to the sellers by defendant and attorney Joyce was simply a ministerial act. If time had permitted, the documents could equally as well have been mailed to the sellers. There is no evidence of any participation by defendant in negotiating the final contract between the sellers and the Sheridan group. In such a situation it appears to us that defendant did not act as a real estate broker but was simply a finder. It follows that the compensation received by defendant for this type of service is not a real estate brokerage commission in which Aimco and Allocco are entitled to share.

The result reached by the trial court that the transaction was not subject to the Aimco-Allocco agreement is supported by an additional cogent reason. In his very first contact with Sheridan, defendant demanded an equity position. This was refused by Sheridan. The agreements prepared by attorney Joyce and by counsel for the Sheridan group were never executed. The relationship between defendant and Sheridan deteriorated. As shown, this culminated in threats by defendant's attorney of filing of suit and the appointment of a receiver for the property. It is definite from the evidence that defendant repeatedly insisted upon taking an active part in the sale of the condominium units and the Sheridan group persisted in rejecting this type of activity by defendant. In this manner, Sheridan clearly indicated that he wished to limit the defendant's participation in the transaction to the services already performed by defendant as finder.

▪▪ With a background of this type, it appears abundantly that the general release incorporated into the final agreement between defendant and the Sheridan group shows that the arrangement between these parties was a purchase of peace by Sheridan and elimination completely of

defendant from the transaction in consideration of the payment to defendant of 25 percent of the net profits. This type of transaction should not be considered as payment of a broker commission.

Aimco and Allocco point out that defendant signed and delivered a letter to the Sheridan group releasing them from all commission claims. The final contract between the seller and the Sheridan group so provided. Aimco and Allocco urge that this indicates that the parties were aware that defendant rendered services as a broker. We cannot agree.

As a general proposition, a broker's commission is paid by the seller. (*Cole v. Brundage* (1976), 36 Ill. App. 3d 782, 795, 344 N.E.2d 583; *Affiliated Realty & Mortgage Co. v. Jursich* (1974), 17 Ill. App. 3d 146, 150, 308 N.E.2d 118; and *Webster*, 105 Ill. App. 2d 466, 477.) Thus it would appear that the insistence by the seller of a waiver of commission and the insertion of such provision in the contract may, with better logic, be ascribed to a cautionary step on the part of an able attorney rather than to an admission by defendant that he was actually entitled to or receiving a commission. Defendant's background supports the former hypothesis. Defendant sought to comply with applicable legal requirements by becoming a licensed salesman. He posted his license with his first employer. When defendant joined a firm of his own he transferred his license to a different broker. Finally he transferred his license to Aimco or Allocco. There is no evidence of any previous claim by Aimco and Allocco against defendant for failure to share commissions.

We will also add that the precise relation of the parties here, as above outlined, is a mixed question of fact and law. There is no dispute about the legal principles applicable here. On the other hand, there are factual issues which were presented to the trial court in connection with the determination of the rights of these parties. After observing and hearing all of the testimony presented in the massive record here, the trial court found that this transaction was outside the scope of the agreement between defendant, Aimco and Allocco. Here also, as in determining the rights of the other parties to this record, we are obliged to follow the universal rule that factual results reached by the trial court should not be set aside if they are not manifestly contrary to the weight of the evidence. (*Reese v. Melahn* (1973), 53 Ill. 2d 508, 512-13, 292 N.E.2d 375.) This is particularly true in the case before us. The intervening plaintiffs Aimco, Inc. and Allocco had the burden of proving by a preponderance of the evidence that the funds disbursed by the Sheridan group to defendant were actually a brokerage commission.

In our opinion, the above considerations are decisive of this phase of the case. We need not consider the remaining contentions of defendant. We accordingly affirm the result reached by the trial court and conclude

that the payments being made to defendant are not within the scope of the brokerage commission agreement between defendant, Aimco and Allocco.

### Directions Upon Remand.

In accordance with the above opinion, the results reached by the trial court on the merits of the situations involving all of the parties hereto are affirmed. However, the cause is remanded to the trial court with the following directions which are concerned solely with the mechanics of the distribution of the funds resulting from the transaction herein and presently held in escrow by the law firm of D'Ancona, Pflaum, Wyatt & Riskind. The following distribution is to be made by appropriate order of the trial court. The trial court may vary the amounts paid only by agreement of the parties or if additional evidence which the trial court may hear requires a variation in the distribution. Subject to those possibilities, the following disbursements are to be made:

(1) Payment to Allen Marrinson of $25,000.

(2) Payment to plaintiff, Jerrold Ruskin, of the sum of $70,000; being the amount received by Rodgers less one-half of fees paid to attorney Edward T. Joyce in the amount of $10,000.

(3) Payment to defendant, James T. Rodgers, of $5000 to equalize this payment of the Joyce fee by Rodgers.

(4) The entire balance remaining in escrow, including interest, is to be divided equally between plaintiff, Jerrold Ruskin, and defendant, James T. Rodgers.

Affirmed and remanded with directions.

McGLOON and O'CONNOR, JJ., concur.