RUNNEMEDE OWNERS, INC., and
Ranjit S. Ghura,
Plaintiffs–Appellants,

v.

CREST MORTGAGE CORPORATION
and Steven M. Rayman,
Defendants–Appellees.

No. 87–1763.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 4, 1987.

Decided Nov. 18, 1988.

Craig P. Rieders, Orenstein & Orenstein, P.C., New York City, for plaintiffs-appellants.

Marguerite M. Tompkins, Jenner & Block, Chicago, Ill., for defendants-appellees.

Before COFFEY and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

COFFEY, Circuit Judge.

This is a diversity case arising from Runnemede's unsuccessful attempts to obtain a business mortgage loan from Crest Mortgage. After considerable effort by both parties and considerable expense by Runnemede, Crest Mortgage refused, at the eleventh hour, to lend Runnemede the proposed mortgage money. Runnemede

sued Crest, asserting state law claims that Crest breached its contract with Runnemede, defrauded Runnemede, and converted the "commitment fee," Runnemede paid to Crest as consideration for the proposed loan. The district court granted Crest's motion to dismiss under Fed.R.Civ.P. 12(b)(6). We affirm.

## FACTS

We accept as true the facts set forth in Runnemede's complaint for the purpose of reviewing the district court's grant of Crest's motion to dismiss.[1] These facts are as follows: On April 18, 1985, plaintiff-appellant Ranjit Ghura entered into a contract to purchase a Holiday Inn in Runnemede, New Jersey, from Turnpike Industries, Inc. for 6.2 million dollars. Ghura proceeded to assign the contract to the plaintiff-appellant Runnemede Owners, Inc., a corporation set up by Ghura, and engaged the services of Theodore Schwartz, a mortgage broker, who attempted to obtain financing for the hotel purchase.[2] Almost a year later, Schwartz contacted Crest Mortgage on Ghura's behalf. During this time period, Runnemede had given Turnpike two down payments in the amount of $50,000 each (curiously, the record fails to reflect whether Ghura's contract with Turnpike was contingent upon Ghura's securing financing).

After negotiating, Crest conditionally agreed (in a limited "commitment letter" executed in March of 1986) to lend Runnemede 5 million dollars if Runnemede could obtain a second mortgage of $950,000 from the seller Turnpike. Turnpike refused to provide the financial assistance, and the parties cancelled the March, 1986, commitment letter shortly thereafter. In March, 1986, Ghura had forwarded another $50,000 "down payment" to Turnpike, as well as $42,000 to Crest ($37,000 as provided in the commitment letter plus a $5,000 application fee).

After the parties cancelled the March, 1986, commitment letter, Crest reconsidered and agreed to issue a second conditional letter, dated April 10, 1986, for the increased sum of 5.5 million dollars. This letter is the subject of the present dispute.

Although labeled a "commitment" letter, Crest did not in fact commit to extend the proposed loan; instead Crest agreed to make the loan *subject to a number of conditions*. Thus a conditional commitment of this nature is not considered in the financial world as an unqualified *guarantee* to extend credit like a letter of credit. More importantly, Crest expressly refused to enter into a binding obligation to fund the loan until such time as it had completed its pre-closing investigation before giving final approval to the loan.

Paragraph IV of the letter, entitled "Conditions of Commitment; Loan Underwriting Requirements," provided in part that "[t]his commitment is subject to the borrower providing to lender at its cost and expense, and the lender in its sole discretion, approving each of the following in form, substance and content:

"4. Three years operating income and expense, and cash flow statements on the property, certified; as well as certified financial statements of borrower and guarantor....

17. Verification by CPA chosen by lender of income and expenses on this facility for 1983 through the present...."

In paragraph VI of the commitment letter, entitled "Voidance of Commitment," Crest reserved the right to cancel the commitment at any time prior to closing if

"... The income or expenses for the property materially and adversely

---

1. This Court grants *de novo* review to a lower court's dismissal of a complaint under the Fed. R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. This Court "... assume(s) that the well-pleaded allegations of the complaint are true. A complaint may be dismissed for failure to state a claim only if the plaintiff can prove no set of facts upon which relief may be granted." *First Interstate Bank of*

*Nevada v. Chapman & Cutler,* 837 F.2d 775, 776 (7th Cir.1988).

2. We generally refer to the plaintiffs in this case as "Runnemede" because the qualified commitment letters were formally entered into by Runnemede.

changes after the date of the commitment or any material adverse change occurs in income, or expenses or property or market conditions in the area of the property...."

The letter further specified that within seven working days after receipt of all the data required under paragraph IV, Crest would notify Runnemede "of its [Crest's] intention to fund or not to fund pursuant to the terms hereof." Finally, the qualified commitment letter provided that the borrower was to pay a commitment fee of $165,000. One half of that amount was due upon acceptance of the qualified commitment letter by the borrower with the remaining payment due and payable upon closing. Crest agreed to refund the deposit on the commitment fee, if, during the underwriting process, Crest determined that it could not fund the loan through no fault of the borrower:

"... In the event that during the underwriting process lender determines that the loan contemplated hereunder, in its sole discretion, cannot be made as anticipated, through no fault of borrower, then the amount of fees paid herewith less the inspection fee ... shall be refunded to borrower."

The letter concluded with this provision: "This commitment letter is subject to the Loan Committee's approval in form and content. The Committee shall approve or disapprove no later than April 15, 1986."

Before executing the qualified commitment letter, Ghura inquired of Steven Rayman, Crest's chairman, concerning the makeup of the Loan Committee reviewing Runnemede's loan application. Rayman replied, "Don't worry about the committee, I am the committee. What I say, goes. We have a deal." Interpreting Rayman's extracontractual statements of assurance as a guarantee that the loan would be approved, Runnemede accepted the April, 1986, qualified commitment, paid Crest another $47,500 toward the $165,000 commit-

ment fee and forwarded another $100,000 to Turnpike as consideration for Turnpike extending the closing date on the hotel sale to May 7, 1986.

Following the parties' execution of the April qualified commitment letter, Crest commenced its underwriting investigation. As part of this investigation, Rayman met with Ghura at the hotel and conducted an inspection of the premises. Upon concluding the inspection, Rayman once again stated to Ghura "we have a deal."

On May 8 and 9, prior to the scheduled closing date, Crest's president, Michael McConnell, advised Ghura orally and in writing that based upon a review of an auditor's report of the recent financial data submitted concerning the hotel, Crest had decided not to extend the loan to Runnemede because Crest believed that the cash flow from the hotel would be insufficient to carry a 5.5 million dollar debt. Accordingly, Ghura was advised that Crest was withdrawing from its qualified mortgage loan commitment. In accordance with the terms of the April 10 letter, Crest offered to refund all deposits that Runnemede paid except for the $2,500 inspection fee. Mr. McConnell also advised Ghura that if Runnemede could reduce its borrowing needs, Crest might reconsider financing the hotel purchase.

In responding to Crest's decision to withdraw, Ghura made no further attempt to negotiate for additional financing on behalf of Runnemede, but filed the instant lawsuit. The suit attempts to state claims for relief premised upon fraud, breach of contract, conversion and racketeering but fails to demand a return of the commitment fee paid to Crest (totaling $89,500). No request has been made for the return of the commitment fee. Based upon the allegations of the plaintiffs' complaint, the district court granted Crest's motion to dismiss the amended complaint in its entirety. On appeal, Runnemede and Ghura have dropped their racketeering allegations.[3]

---

**3.** An action under the federal racketeering statute, 18 U.S.C. § 1961, requires the plaintiff to establish a "pattern of racketeering activity,"

and the predicate acts of fraud which form the alleged "pattern" "must be ongoing over an identified period of time so that they can fairly

The parties agree that Illinois law governs in this diversity action. "Parties can within broad limits stipulate the substantive law to be applied to their dispute"; *Casio, Inc. v. S.M. & R., Inc.,* 755 F.2d 528, 531 (7th Cir.1985). The litigants have not contested the trial court's application of Illinois law; thus, we apply Illinois law. *See City of Clinton v. Moffitt,* 812 F.2d 341, 342 (7th Cir.1987).

## BREACH OF CONTRACT

■ Runnemede and Ghura allege in their complaint that Crest breached a written contract binding Crest to loan Runnemede 5.5 million dollars. The purported contract is the April 10 qualified letter of commitment; but what are its terms? Essentially, the qualified commitment letter outlined the terms of a proposed loan and only bound Crest to *consider* lending Runnemede money, subject to the conditions set forth in paragraph IV of the letter. In other words, the letter was nothing more than an agreement to consider extending a loan, not an unqualified promise that such consideration would yield the financial help desired. We believe this construction is in keeping with the function and reason for a conditional letter of commitment—to provide the initial framework from which the parties might later negotiate a final loan agreement, if the deal works out. In an analogous situation involving the interpretation under Illinois law of a preliminary letter of intent between purchaser and seller, we explained that:

> "A complex business transaction ... requires a significant expenditure of time, effort, research and finances simply to arrive at its terms. The books of the companies must be carefully reviewed, difficult judgments of valuation must be made, financing must be secured, new corporations may have to be formed, and various timing and risk allocation issues must be spelled out in detail in the purchase and sale contract, obviously incurring substantial legal fees. Depending

upon the specifics of the deal, other professional services such as accounting and financing may have to be commissioned as well. Together, all these costs in executing a complex transaction may consume more than a trivial portion of the benefit the parties hope to realize. This cost may be too high if it need be borne without some assurance that it will culminate in a sale.... When a deal necessarily is preceded by costly groundwork, a letter of intent may benefit both the purchaser and the seller. Although much work remains to be done, indeed virtually all the details remain open, the buyer secures the seller's undivided attention as long as progress continues in ironing out the points of the transaction. Neither party has committed himself to the exchange. Both have agreed to work toward it. While success is not certain, it is more likely and the fear of wasted or duplicative effort is reduced."

*Feldman v. Allegheny International, Inc.,* 850 F.2d 1217, 1221 (7th Cir.1988).

The Illinois law of contract has long recognized that parties may agree that further consideration and/or formal execution of a contract will be necessary to create binding relations. *See Baltimore and Ohio Southwestern R.R. v. People ex rel. Allen,* 195 Ill. 423, 428, 63 N.E. 262, 263 (1902); *Brunette v. Vulcan Materials Co.,* 119 Ill.App.2d 390, 256 N.E.2d 44 (1970); *Terracom Development Group v. Coleman Cable and Wire Co.,* 50 Ill.App.3d 739, 8 Ill.Dec. 642, 365 N.E.2d 1028 (1st Dist.1977). Runnemede's and Crest's contract is subject to conditions of this nature.

In this case, paragraph IV of the qualified commitment letter provided that:

> "[t]his commitment is subject to the borrower providing to lender at its cost and expense, and lender *in its sole discretion,* approving each of the following in form, substance and content:

> \* \* \* \* \* \*

> 17. Verification by CPA chosen by lender of income and expenses on this facil-

---

be viewed as constituting separate transactions." *Medical Emergency Service Associates v. Foulke,* 844 F.2d 391, 395 (7th Cir.1988). The isolated

episode of "fraud" alleged in the plaintiff's complaint clearly fails to meet this circuit's articulation of the "pattern" requirement.

ity for 1983 through the present....."
(Emphasis added).

Having thus agreed to *consider* extending a loan, paragraph IV sets forth in detail the conditions precedent to a binding contract; the approval by Crest in its sole discretion of items 1–20 listed in that paragraph. The letter further specifies that in the event Crest does not approve, no obligation to make the loan arises. Thus, the letter for all intents and purposes attempted to eliminate any misunderstanding arising out of the parties' negotiations. According to the complaint and an attached exhibit, Crest did consider the loan, but after conducting an audit determined that the "cash flow from the property will be inadequate to service the financing anticipated under our conditional commitment letter." Because of Crest's determination, under the clear terms of paragraph IV, no binding contract to extend the loan arose. Runnemede is now attempting to convert the qualified letter of commitment into a binding contract to extend the loan. We are convinced that Crest never unconditionally agreed to make the loan to Runnemede. Runnemede's interpretation runs contrary to the intent of the parties expressed in the conditional written commitment letter.

Runnemede nevertheless maintains in its brief (but not specifically in its pleadings) that Crest failed to notify Runnemede of its intention to fund or not to fund the loan within seven days following receipt of the materials specified in paragraph IV, as required by the conditional commitment letter; and thus Crest waived its right to withhold giving its consent to a binding contract. The district court rejected this assertion, finding that Runnemede failed to allege in its complaint that Crest did not give timely notice of its final decision on Runnemede's loan application. We agree that Runnemede's omission to specifically allege Crest's noncompliance with the notice provision *in its pleadings* prevents our consideration of this issue on appeal. We

have noted that the "consideration of a motion to dismiss is limited to the pleadings," and thus assertions contained only in the briefs may not be used to expand the allegations of the complaint. *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984).

Runnemede attempts an end-run around this problem arguing that its general allegation that "all conditions precedent required by the contract have occurred or have been complied with by Runnemede" excuses any obligation it might have to specifically allege in its complaint the untimeliness of the notice given to Runnemede. Runnemede notes that under Fed. R.Civ.P. 9(c), a complaint is sufficient if it generally alleges "that all conditions precedent have been performed or have occurred," and suggests that the letter's seven-day notice provision is somehow a condition precedent to Crest's right to invoke paragraph IV in refusing to extend the loan. Hence, Runnemede concludes that a general allegation that all conditions have been fulfilled, when broadly read, alleges a breach of the notice provision.

Even if the notice provision can be termed a condition precedent within the meaning of Rule 9(c), a doubtful proposition,[4] Runnemede's theory fails because its complaint merely alleged that Runnemede had complied with *its conditions precedent* (*e.g.* furnishing the required financial data); it did not allege a *failure* of a condition precedent (such as the notice provision) running to Crest, which under the same rule must "be made specifically and with particularity." Fed.R.Civ.P. 9(c). While the party denying the occurrence of the supposed "condition" in this case is the plaintiff (usually the defendant will be the party challenging the occurrence of a condition), the principle behind Rule 9(c) is the same:

"Rule 9(c) is designed to eliminate the detailed and largely unnecessary averments that resulted under the common law procedure, and to prevent nonmerito-

---

**4.** The notice provision is most accurately described as merely a contractual term of the commitment letter, and the plaintiff must have alleged a breach thereof to preserve the issue for trial. *See* C. Wright and A. Miller, *Federal Practice and Procedure,* § 1235.

rious dismissals for failure to plead the underlying fulfillment of conditions precedent that are not at issue in the suit."

*See* C. Wright and A. Miller, *Federal Practice and Procedure,* § 1302. But,

"[a] party who intends to controvert the claimant's general allegation of performance is ... given the burden of identifying those conditions he believes are unfulfilled and wishes to put into issue; *he cannot raise an issue of nonperformance by a general denial.*"

*Id.* at § 1304 (emphasis added). Thus, Runnemede's argument that the notice provision is a condition precedent to Crest's refusal to extend a loan also undercuts its position that a general allegation suffices to allege a lack of notice, for under Rule 9(c) the failure of an alleged condition must have been *specifically* alleged. Having failed to allege the existence of a binding contract to loan Runnemede the proposed mortgage money, we concur in the district court's decision that the plaintiff's breach of contract count fails to state a claim upon which relief may be granted.

## FRAUD

■ Count III of the complaint alleged that Crest Mortgage and Steven Rayman participated in a scheme to defraud Runnemede, apparently for the purpose of obtaining the use of Runnemede's $89,500 commitment fee for a period of time.[5] Runnemede contends that Rayman's optimistic "we have a deal" assurances were evidence of fraud as they were allegedly made with the intent to ultimately deny the loan. The district court properly found these allegations insufficient to state a claim for fraud as a matter of law.

All parties agree that to make out a claim for fraud under Illinois law, the plaintiff must demonstrate:

"(1) A false statement of material fact; (2) by a party who knows or believes it to be false; (3) with the intent to induce

another to act; (4) action by another in reliance on the statement's truth; and (5) injury to the other resulting from that reliance. *In addition, the injured party must have been justified in relying on the other's statement.*"

*Tan v. Boyke,* 156 Ill.App.3d 49, 108 Ill. Dec. 229, 508 N.E.2d 390, 393 (1987) (citations omitted) (emphasis added). *See also Soules v. General Motors Corp.,* 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 402 N.E.2d 599, 601 (1980). Of these elements, the most clearly missing in this case is the element of justifiable reliance, which under Illinois law must be established by clear and convincing evidence. *See National Republic Bank v. National Homes Construction Corp.,* 63 Ill.App.3d 920, 21 Ill.Dec. 80, 381 N.E.2d 15, 18 (1978). One Illinois court has explained the rule of justifiable reliance as follows:

"In determining whether a party justifiably relies on another's representations, all of the circumstances surrounding the transactions, including the parties' relative knowledge of the facts available, opportunity to investigate the facts and prior business experience, will be taken into consideration. Only where the parties do not have equal knowledge, or access thereto, or where there are other peculiar circumstances inducing the injured party to rely solely on the representation of the other will a person be found to have justifiably relied upon the others' representations. The plaintiffs herein were experienced business persons.... There was ample opportunity for the plaintiffs to conduct their own investigation.... Apparently they chose not to do so. On these facts we do not hesitate to affirm the finding by the trial judge that no actionable fraud could be found."

*Luciani v. Bestor,* 106 Ill.App.3d 878, 62 Ill.Dec. 501, 436 N.E.2d 251, 256 (1982) (citation omitted). Thus, "the crucial question is whether the plaintiffs' conduct was so unreasonable under the circumstances

---

**5.** That this could be the purpose of the alleged fraud seems farfetched. Even if Crest were to earn (and keep) interest on this sum, the amount would in all probability be insufficient to cover underwriting costs, as well as the time and effort necessary to perpetrate the alleged fraud.

and 'in light of the information open to him, that the law may properly say that the loss is his own responsibility.'" *Teamsters Local 282 Pension Trust Fund v. Angelos*, 839 F.2d 366, 371 (7th Cir.1988) (quoting *Chicago Title and Trust Company v. First Arlington National Bank*, 118 Ill. App.3d 401, 73 Ill.Dec. 626, 454 N.E.2d 723, 729 (1983) (quoting W. Prosser, *Law of Torts* § 108, at 715 (4th ed. 1971)).

We have explained that the unambiguous terms of the April 10 qualified letter of commitment only bound Crest to *consider* extending a loan to Runnemede under certain specified conditions. Taking into consideration that Ghura is an experienced businessman,[6] he certainly should have proceeded with caution when confronted with oral representations inconsistent with the written terms of the contract, such as Rayman's "we have a deal" assurances. Likewise, Rayman's representation that "I am the committee. What I say goes," is directly contrary to the specific limiting terms of the parties' written contract. *Cf. Turner v. Johnson and Johnson*, 809 F.2d 90, 96 (1st Cir.1986) ("a contractual provision flatly contradictory to prior oral assurances should cause most people—and particularly experienced, knowledgeable business people—to pause."); *Zobrist v. Coal-X, Inc.*, 708 F.2d 1511 (10th Cir.1983) (memo outlining the risks of an investment superseded a contemporaneous oral assertion that the investment was risk-free). Under these circumstances, we hold that the unambiguous written contract controls. *See Sunstream Jet Express, Inc. v. International Air Service Co.*, 734 F.2d 1258, 1268 (7th Cir.1984) ("[R]ecent Illinois decisional law clearly provides that when interpreting a contract, parol and extrinsic evidence is only admissible at trial, for consideration by the trier of fact, if the trial court determines, as a matter of law, that the contract is ambiguous") (Overruling *Ortman v. Stanray Corp.*, 437 F.2d 231 (7th Cir.1971)). Without such a holding:

"Contracts would become no more than presumptive statements of the parties'

intentions, instead of legally enforceable agreements. And the give-and-take of negotiations would become meaningless if, after making concessions in order to obtain other contractual protections, a knowledgeable party is later able to reclaim what it had given away by alleging that it had, in fact, relied not on the writing but on the prior oral statements."

*Turner*, 809 F.2d at 96. Ghura is unable to satisfactorily explain his reliance on Rayman's assertions which were clearly contrary to the contemporaneously executed written contract. We conclude that Ghura did not act with reasonable prudence in relying on Rayman's assertions, and "the law may properly say that the loss is his responsibility." *Teamsters Local 282*, 839 F.2d at 371.

Moreover, even assuming *arguendo* that it was reasonable for Ghura to have relied on Rayman's wayward representations, the pleadings cast substantial doubt on the theory that Ghura in fact relied on those representations in forwarding a commitment fee to Crest and another down payment to Turnpike. At the time of Rayman's initial "we have a deal" assurance, on April 10, 1986, Ghura had already forwarded three separate $50,000 down payments to Turnpike, as well as $42,000 to Crest as part of the commitment fee. Thus it is patently self-contradictory for Runnemede to allege, on one hand, the long history of down payments to Turnpike, and on the other, loss of those payments as indicia of its reliance on Crest's purported fraud. Runnemede's loss of its down payments to Turnpike is more the result of Runnemede's lack of care (by failing to secure definite financing before making substantial down payments) than any wrongdoing on the part of Crest. In sum, Runnemede's complaint fails to adequately allege either that it detrimentally relied on Rayman's supposed fraudulent misrepresentations or that, assuming it did rely, it was justified in doing so.

---

**6.** Ghura's initial loan application noted that he owned three other hotels in Florida and New York.

## CONVERSION

Runnemede finally suggests that even if Crest neither defrauded nor breached its contract with Runnemede, Crest is liable for converting the amount that Ghura had previously paid as a deposit on the commitment fee ($89,500) because Crest has not returned its deposit. This is a strange case for an allegation of conversion, since Crest, in its letter to Runnemede of May 9, 1986, promised outright that "all deposits made in conjunction with the commitment will be refunded less the inspection fee [amounting to $2,500]." Runnemede complains that it hasn't received its deposit according to the terms of this letter, but does not allege in its complaint that it has even requested affirmatively the return of the money. Instead, for reasons unknown, it has chosen to seek a judicial remedy.[7]

Because Runnemede prematurely chose this course of action, a judicial remedy will not be forthcoming. As all parties must have recognized, it has long been established in Illinois that a cause of action for conversion requires a plaintiff to demonstrate:

> "(1) An unauthorized and wrongful assumption of control, dominion, or ownership by a person over the property of another; (2) plaintiff's right in the property; (3) plaintiff's right to immediate possession of the property; and (4) *a demand by plaintiff for possession thereof.*"

*Eggert v. Weisz,* 839 F.2d 1261, 1264 (7th Cir.1988) (quoting *de St. Aubin v. Johnson,* 151 Ill.App.3d 184, 188, 104 Ill.Dec. 97, 502 N.E.2d 360, 364 (1986)). *See also Katz v. Belmont National Bank of Chicago,* 112 Ill.2d 64, 68, 96 Ill.Dec. 697, 491 N.E.2d 1157, 1158–59 (1986). Runnemede weakly asserts and assumes that a demand would have been futile, and thus it is not required

to request the money's return before filing suit. True, cases such as *Monroe County Water Cooperative v. City of Waterloo,* 107 Ill.App.3d 477, 63 Ill.Dec. 315, 437 N.E. 2d 1237 (1982) hold that futile demands need not be made. But *Monroe* itself notes that the "futility" exception has only been applied where the defendant has sold or otherwise disposed of the property, thus rendering a demand superfluous under any circumstances. 107 Ill.App.3d at 481, 63 Ill.Dec. 315, 437 N.E.2d 1237. *See also A.T. Kearney, Inc. v. INCA International, Inc.,* 132 Ill.App.3d 655, 87 Ill.Dec. 798, 806, 477 N.E.2d 1326, 1334 (1985). That is not the situation here; indeed, Crest has never parted with Ghura's deposit money, and there is every indication in the record that a demand would have served the primary purpose of the demand requirement under Illinois law: to allow the defendant to return the property before being required to submit to unnecessary litigation. Runnemede's subjective belief that demand would have been refused is no excuse (such a rule would eviscerate the demand requirement); absent objective facts demonstrating futility, Illinois law is that "an action for conversion ... must include a demand for possession or it cannot be said there has been a deprivation." *A.T. Kearney,* 87 Ill.Dec. at 806, 477 N.E.2d at 1334. We hold that the district court's action in dismissing Runnemede's conversion claim was proper.

## CONCLUSION

The district court's grant of the defendant's motion to dismiss the plaintiff's complaint under Fed.R.Civ.P. 12(b)(6) is

**AFFIRMED.**

---

7. And, we hasten to add, a significantly more expensive remedy. There is nothing in the record to suggest that a simple phone call would not have resulted in the immediate return of Runnemede's deposit. At oral argument, plaintiffs' counsel asserted that his client decided not to ask for return of the money for fear of waiving substantive rights. If this was a strategic decision, the strategy was ill-advised. As the text will explain, Illinois law requires that a plaintiff affirmatively demand the return of money before he or she may sue for conversion; moreover, as Judge Eschbach pointed out during argument, the plaintiff could easily have undertaken such a demand while reserving its rights to sue Crest on other grounds.