**Gregory GLASS, Plaintiff,**

v.

**KEMPER CORPORATION, The Prime Group, Inc., Prime International, Inc., Steven Timbers, John Neal, Michael Oberst, Defendants.**

No. 95 C 3178.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 16, 1997.

Alan Jay Mandel, Chicago, IL, for Gregory Glass.

Bennett L. Epstein, John Friedrich Zabriskie, Diane E. Gianos, Hopkins & Sutter, P.C., Chicago, IL, for Kemper Corp., Steven Timbers and John Neal.

Robert N. Hermes, Butler, Rubin, Saltarelli & Boyd, Chicago, IL, for Prime Group, Inc. and Prime Intern., Inc.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Before the court are three motions for summary judgment by defendants in this case: one by defendant Michael Oberst ("Oberst"); one by defendant Kemper Corporation ("Kemper"); and one by defendants Prime Group, Inc. ("Prime Group"), and Prime International, Inc. ("PII") (collectively,

"Prime defendants"), who also adopt Kemper's motion. For the reasons that follow, the court strikes Oberst's motion as moot and grants the remaining defendants' motions.

## I. *BACKGROUND* [1]

In November 1992, plaintiff Gregory Glass ("Glass") began working for Kepro, S.A. ("Kepro"), and defendant Prime Group in Barcelona, Spain, on the development of a shopping mall to be known as Diagonal Mar. At that time, defendant PII, an affiliate of Prime Group, owned 85 percent of the stock of a holding company that owned 100 percent of Kepro. Defendant Kemper had an option to purchase controlling shares in the holding company. Kemper also provided funding for the Diagonal Mar project.

In May 1994, Kemper entered into agreements with Prime Group and PII by which Kemper took primary control of the Diagonal Mar project. Defendant Michael Oberst, a vice president of Kemper, became managing director of Kepro and assumed responsibility for managing the overall development of Diagonal Mar.

Also in May 1994, Oberst began negotiations with Glass and four other Kepro/Prime Group expatriate employees for new employment agreements. In various memos between Glass and Oberst, Oberst wrote that any new employment terms would have to be approved by Kemper and the Kepro board of directors. In September 1994, it appeared that Oberst and the expatriates had reached agreement on the expatriates' revised employment terms. However, the terms were never approved by the Kepro board. The employment negotiations continued, but on October 20, 1994, Oberst fired Glass.

Glass filed a lawsuit in this court,[2] alleging various counts against various defendants. In its prior opinions, *see Glass v. Kemper*, 920 F.Supp. 928 (N.D.Ill.1996); *Glass v. Kemper*, 930 F.Supp. 332 (N.D.Ill.1996), the court dismissed the individual defendants and dismissed Count VI against all defendants. In addition, Glass has waived his

claim in Count V for unjust enrichment. (*See* Final Pretrial Order at 17.) Therefore, only Counts I (promissory fraud), II (breach of contract), III (promissory estoppel), and IV (equitable estoppel) remain pending against Prime Group, PII, and Kemper.

## II. *DISCUSSION*

Oberst, Kemper, and the Prime defendants move for summary judgment against Glass, but for different reasons. Therefore, the court will address each motion separately.

### A. *Standard for deciding a motion for summary judgment*

A motion for summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden is on the moving party to show that no genuine issues of material fact exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the moving party presents a *prima facie* showing that he is entitled to judgment as a matter of law, the party opposing the motion may not rest upon the mere allegations or denials in its pleadings but must set forth specific facts showing that a genuine issue for trial exists. *Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514; *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir.1989). All reasonable factual inferences must be viewed in favor of the nonmoving party. *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir. 1989).

### B. *Oberst's motion for summary judgment*

On June 25, 1996, a week after Oberst filed his motion for summary judgment, the court

---

**1.** These uncontested facts are taken from the parties' Rule 12(M) and 12(N) statements and the complaint.

**2.** Glass brought his complaint in this court on the basis of diversity of citizenship. *See* 28 U.S.C. § 1332.

granted Oberst's earlier filed motion to dismiss for lack of personal jurisdiction and dismissed Oberst as a party defendant. Since Oberst is no longer a party in this case, his motion for summary judgment is moot, and therefore is stricken.

## C. *Prime defendants' motion for summary judgment*

Prime Group and PII argue that Glass's complaint seeks to hold them liable for Kemper's alleged promises of a new employment agreement on principles of agency and joint venture liability. They contend that they are entitled to summary judgment for two reasons: Glass has admitted that he does not believe that Prime and PII are responsible for unsatisfied obligations of the purported agreement between Glass and Kemper; and the record does not sustain a theory of agency or joint venture liability as a matter of law.

### 1. Glass's admissions

■ Prime and PII first argue that in his deposition testimony, Glass has acknowledged that no obligation in the employment contract between Glass and Prime Group remains unsatisfied, and that neither Prime nor PII is responsible for any unsatisfied obligation of the new agreement that Glass believes he had with Kemper. The Prime defendants' argument ignores the fact that Glass cannot testify as to legal conclusions, such as the relationship between the Prime defendants and Kemper.

In his deposition, Glass himself stated that he did not know how the Glass/Prime agreement related to the Glass/Kemper agreement, but simply that he believed he had an agreement with Kemper. (App. to the Prime Defs.' Mot. for Summ. J. Ex. 1 at 206.) He also stated that he was not privy to any or all of the agreements that Kemper may have had with Prime Group or PII that may have affected the agreement he believes he had with Kemper. (*Id.* at 207.) In Glass's deposition, counsel for the Prime defendants asked Glass to give legal conclusions that he was neither qualified nor entitled to give. These inappropriate conclusions can serve neither to support nor defeat the Prime de-

fendants' motion for summary judgment. Rather, the key to the motion is the legal relationship between the Prime defendants and Kemper.

### 2. Existence of agency or joint venture relationship between the Prime defendants and Kemper

The Prime defendants next argue that Glass has not established a joint venture relationship between them and Kemper, and therefore that they cannot be held liable for any acts of Kemper.

■ A joint venture is

an association of two or more persons [or entities] to carry out a single enterprise for profit. A formal agreement is not essential to establish a joint venture. Rather, the existence of a joint venture may be inferred from the facts and circumstances demonstrating that the parties in fact entered into a joint venture. In determining whether a joint venture exists, the intent of the parties is the most significant element.

*O'Brien v. Cacciatore,* 227 Ill.App.3d 836, 843, 169 Ill.Dec. 506, 510, 591 N.E.2d 1384, 1388–89 (1st Dist.1992) (citations omitted).

■ The following elements must be present for a joint venture to exist: (1) an agreement to carry on a single enterprise with a legitimate purpose; (2) a community of interest in the purpose; (3) expectation of profits; (4) duty to share profits and losses; and (5) the right of each person to direct and govern the conduct of the other members of the venture. *See Pinkowski v. Coglay,* 347 F.2d 411, 413 (7th Cir.1965), *cert. denied,* 386 U.S. 1036, 87 S.Ct. 1473, 18 L.Ed.2d 599 (1967); *O'Brien,* 227 Ill.App.3d at 843, 169 Ill.Dec. at 511, 591 N.E.2d at 1389; *Baker v. Walker,* 173 Ill.App.3d 836, 839, 123 Ill.Dec. 621, 623, 528 N.E.2d 5, 7 (1st Dist.1988) (citations omitted). The burden of proving that a joint venture exists is on the party claiming that such a relationship exists, and whether or not a joint venture exists typically is a question of fact for the trier of fact. *O'Brien,* 227 Ill.App.3d at 843, 169 Ill.Dec. at 511, 591 N.E.2d at 1389 (citations omitted).

If a joint venture exists, the rights and liabilities of its members are governed by the principles of partnerships. *Smith v. Metropolitan Sanitary Dist. of Greater Chicago,* 77 Ill.2d 313, 318, 33 Ill.Dec. 135, 138, 396 N.E.2d 524, 527 (1979). Thus, every member of the joint venture is considered an agent of the joint venture for purpose of carrying on its usual course of business, *id.,* and "can be held liable to a third party for the acts of the other joint venturers done in the course of the enterprise." *Fentress v. Triple Mining, Inc.,* 261 Ill.App.3d 930, 940, 200 Ill.Dec. 1, 7, 635 N.E.2d 102, 108 (4th Dist.1994) (citing *Tassan v. United Devel. Co.,* 88 Ill.App.3d 581, 588, 43 Ill.Dec. 769, 775, 410 N.E.2d 902, 908 (1st Dist.1980)).

The Prime defendants contend that with respect to Diagonal Mar, no evidence exists to suggest an agreement between the Prime defendants and Kemper to share profits and losses. They also argue that after May 1994, Kemper took control of Diagonal Mar, and Prime Group essentially was not involved in the project and had no control over Kemper with respect to Diagonal Mar. Therefore, they argue, two critical elements of a joint venture are missing.

Glass counters that Kemper and Prime Group called themselves joint venturers in business agreements; carried on Diagonal Mar as a single enterprise, with Kemper providing capital and Prime Group providing expertise; jointly exercised control over the project, with Prime Group's vice president originally hiring Glass and Kemper's vice president conducting negotiations to enhance Glass's agreement to induce him to stay on the job; intended to share in the profits of Diagonal Mar; and intended to co-own Diagonal Mar upon its completion.

Glass also argues that although no express agreement to share losses existed between Kemper and Prime Group, an express agreement is not required to find a joint venture. *See Ambuul v. Swanson,* 162 Ill.App.3d 1065, 1070, 114 Ill.Dec. 272, 276, 516 N.E.2d 427, 431 (1st Dist.1987) (citing *Ruskin v. Rodgers,* 79 Ill.App.3d 941, 35 Ill.Dec. 557, 399 N.E.2d 623 (1st Dist.1979)). Moreover, Glass contends that an implicit agreement to share losses existed between Prime Group and Kemper, because prior to Diagonal Mar's completion, Kemper could deflect losses to Prime Group as financing debt or assume some of the loss by writing off some of that financing debt.

Each party has presented evidence that supports its position; thus, the most that can be said regarding the joint venture issue is that it remains a question of fact that cannot be decided on a motion for summary judgment. Glass's and the Prime defendants' Local Rule 12(M) and 12(N) statements contradict each other with respect to the joint venture issue. Glass contends, and the Prime defendants deny, that both Prime and Kemper exercised some level of control over the Diagonal Mar project through and after May 1994. (Pl.'s Rule 12(N) Statement of Contested Facts ¶ 9.)

In addition, in his deposition, Prime Group's president, Michael Reschke, testified that Prime Group and Kemper were "50/50 partners" on all their real estate projects, including Diagonal Mar. (*Id.* Ex. B at 43.) Reschke also stated that he viewed Kemper as a joint venturer with Prime Group on Diagonal Mar, and that all of the Spanish projects under the Kepro name were joint ventures between Prime Group and Kemper. (*Id.* at 173.) He stated that in early 1993 and thereafter, Prime Group and Kemper had joint control of Kepro and were partners, but that Kemper had "sort of de facto control" because Kemper had invested all of the money in Kepro. (*Id.* at 34.) Yet, in that same deposition, Reschke stated that Prime Group had not been involved in the Diagonal Mar project since 1993. (*Id.* at 26.) In his deposition, Reschke also indicated that Prime and Kemper shared in losses from Diagonal Mar. (*Id.* at 40.)

Reschke testified that Prime and Kemper agreed that after September 1994, several Prime employees, including Glass, would remain Prime employees in a technical sense but actually work for Kemper on Diagonal Mar. (*Id.* at 139–40). Moreover, in September 1994, Oberst wrote a memorandum to Glass and the other expatriates regarding their employment status. The memo informed the employees that they would continue as Prime Group employees under the

Prime Group Services Agreement with Kepro and Diagonal Mar; that Kemper had approved this arrangement; that there was a need to put into place additional agreements between Kemper, Prime Group, and Kepro relating to the employment agreements; and that Kemper was trying to get Prime Group to implement the revisions to the employment agreements. (Id. Ex. D.)

Reschke's testimony and Oberst's memo regarding the employment status of Glass and the other employees indicates that Prime and Kemper both exerted some joint control over Diagonal Mar, at least with respect to employees, and were working towards a single enterprise.

Furthermore, in August 1993, the president of Kemper wrote a letter to Reschke intending to set forth the agreement between Kemper and Prime Group to carry out certain projects, among them Diagonal Mar. The letter referred to Diagonal Mar as a "Non–REIT Joint Venture." (Id. Ex. K to Ex. H.) In addition, a May 1994 letter from Kemper to the Prime defendants, among other entities, stated that Prime Group would be entitled to a "Joint Venture Finder's Fee" of two percent of any equity investment or sales proceeds procured by Prime Group for the retail portion of Diagonal Mar. (Id. Ex. J at 5.)

In sum, Glass has presented more than enough evidence to create a genuine issue of material fact regarding whether the Prime defendants and Kemper were joint venture partners in Diagonal Mar such that the Prime defendants can be held liable for Kemper's conduct towards Glass. Since a genuine issue of material fact exists, summary judgment in favor of the Prime defendants based on their joint venture argument is inappropriate.

However, the Prime defendants have stated that they also adopt Kemper's motion for summary judgment. Although no arguments raised in Kemper's motion directly apply to the Prime defendants, the Prime defendants' liability is only derivative of Kemper's liability. Consequently, if the court grants summary judgment in favor of Kemper, it also must grant summary judgment in favor of the Prime defendants. Therefore, while the court finds that the Prime defendants' own motion does not warrant summary judgment in their favor, the court's ultimate ruling whether summary judgment should be granted in favor of the Prime defendants depends upon the court's ruling with respect to Kemper.

### D. *Kemper's motion for summary judgment*

Kemper's arguments in support of its summary judgment motion for the most part are based on Kemper's claim that Glass had written notice that Oberst could not enter into a binding employment contract with Glass without approval by Kemper and the Kepro board of directors.

#### 1. Counts I, III, and IV—fraud and estoppel claims

Kemper first contends that because Glass had written notice that any new employment terms required Kemper and Kepro approval, Glass's reliance on any alleged promises or representations by Oberst that he had authority to make a binding commitment on behalf of Kemper was unreasonable. Therefore, Glass's claims of promissory fraud, promissory estoppel, and equitable estoppel must fail because each requires that the plaintiff prove that he reasonably and justifiably relied upon the defendant's representations.

To make out a claim for promissory fraud, promissory estoppel, or equitable estoppel, a plaintiff must establish, among other things, that he was justified in relying on the allegedly false statements of the defendant. *See Runnemede Owners, Inc. v. Crest Mortgage Corp.*, 861 F.2d 1053, 1058 (7th Cir.1988) (promissory fraud); *Mason & Dixon Lines, Inc. v. Glover*, 975 F.2d 1298, 1305 (7th Cir.1992) (promissory estoppel); *Black v. TIC Investment Corp.*, 900 F.2d 112, 115 (7th Cir.1990) (equitable estoppel).

The court in *Runnemede* explained the rule of justifiable reliance:

"In determining whether a party justifiably relies on another's representations, all of the circumstances surrounding the

transactions, including the parties' relative knowledge of the facts available, opportunity to investigate the facts and prior business experience, will be taken into consideration. Only where the parties do not have equal knowledge, or access thereto, or where there are other peculiar circumstances inducing the injured party to rely solely on the representation of the other will a person be found to have justifiably relied upon the other's representations. . . .

*Runnemede*, 861 F.2d at 1058 (quoting *Luciani v. Bestor*, 106 Ill.App.3d 878, 884, 62 Ill.Dec. 501, 506, 436 N.E.2d 251, 256 (3d Dist.1982) (citation omitted)). "Thus, 'the crucial question is whether the plaintiff's conduct was so unreasonable under the circumstances and "in light of the information open to him, that the law may properly say that the loss is his own responsibility." ' " *Runnemede*, 861 F.2d at 1058–59 (quoting *Teamsters Local 282 Pension Trust Fund v. Angelos*, 839 F.2d 366, 371 (7th Cir.1988) (quoting *Chicago Title and Trust Co. v. First Arlington Nat'l Bank*, 118 Ill.App.3d 401, 409, 73 Ill.Dec. 626, 632, 454 N.E.2d 723, 729 (1st Dist.1983) (quoting W. PROSSER, LAW OF TORTS § 108 at 715 (4th ed.1971)))).

In *Runnemede*, the plaintiff needed assistance with financing his purchase of a hotel, so sought a loan from the defendant. The defendant eventually agreed to make a loan to the plaintiff, subject to a number of conditions. *Runnemede*, 861 F.2d at 1054. The defendant drafted a commitment letter setting forth the agreement and stating that the form and content of the commitment letter was subject to the loan committee's approval. Before signing the commitment letter, the plaintiff asked the defendant's chairman about the makeup of the loan committee that was to review plaintiff's loan application. The chairman replied, "Don't worry about the committee, I am the committee. What I say, goes. We have a deal." *Id.* at 1054–55.

Interpreting the chairman's statements as a guarantee that the loan would be approved, the plaintiff accepted the commitment letter. After the parties executed the commitment letter, the defendant began its underwriting investigation. As part of the investigation, the chairman met with the plaintiff at the hotel and inspected the property. At the conclusion of the inspection, the chairman again told plaintiff that they "had a deal." *Id.*

Unfortunately for the plaintiff, the loan committee disagreed. Prior to the closing date on the hotel, the defendant's president informed the plaintiff that the defendant had decided not to extend the loan because it believed the cash flow from the hotel would be insufficient to carry the debt. Consequently, the defendant withdrew from its commitment letter and offered to refund the plaintiff's deposits. *Id.* In response, the plaintiff sued the defendant on various grounds, including fraud. The district court granted the defendant's motion to dismiss the complaint in its entirety. The plaintiff appealed. *Id.*

The court of appeals agreed with the district court that the plaintiff had failed to state a fraud claim, finding that the plaintiff had not established that he justifiably relied upon the representations of the defendant's chairman that the loan committee would approve the loan application. *Id.* at 1058–59. The court found that the qualified commitment letter bound the defendant only to consider making a loan to the plaintiff. It stated that taking into account that the plaintiff was an experienced businessman, he should have proceeded with caution when the defendant's chairman made oral representations inconsistent with the written terms of the qualified commitment letter. *Runnemede*, 861 F.2d at 1059. The court concluded that the plaintiff did not act with reasonable prudence in relying on the chairman's assertions, and that " 'the law may properly say that the loss is his responsibility.' " *Id.* (quoting *Teamsters Local 282*, 839 F.2d at 371).

In *Mason & Dixon*, the Seventh Circuit applied similar reasoning to uphold summary judgment against the plaintiffs on their promissory estoppel claim. *Mason & Dixon*, 975 F.2d at 1305. There, the court held that the plaintiffs could not reasonably rely on a union pension fund trustee's oral assurances that he had authority to settle litigation between the plaintiffs and the pension fund, where the trustee previously had written in a

letter to the plaintiffs that *all* of the trustees of the pension fund must agree to the settlement. Therefore, the district court was correct in granting summary judgment for the defendants on the plaintiffs' promissory estoppel claim. *Id.*

■ In the present case, during the lengthy negotiations over new employment agreements between Kemper and the expatriates, Oberst repeatedly told Glass in written notes that any revised employment terms would have to be approved by Kemper and the Kepro board of directors. (*See* Defendants' Consolidated General Rule 12(M) Statement of Undisputed Material Facts Entitling Them to Summary Judgment ("Defs.' Rule 12(M) Statement"), Ex. L at GL 00055, 00061; Ex. S at GL 00082.) On September 14, 1994, Oberst told the expatriates that Kemper had approved new employment terms, which were being offered to the expatriates. However, even then, Oberst made clear in writing that the agreements remained to be formally approved by the Kepro board of directors at a meeting the following week. (*See id.* Ex. T.) [3]

Moreover, Glass's own writings establish that he knew that new employment terms had to be approved by Kemper and the Kepro board of directors. In June 1994, Glass wrote to Oberst asking that the expatriates' concerns regarding their employment contracts be addressed by the Kepro board or by an individual with authority to make a binding commitment. (*See id.* Ex. M at GL 00079.) This statement to Oberst indicates that Glass recognized that Oberst lacked authority to take care of the expatriates' concerns, but that the Kepro board had such authority.

On October 10, 1994, Glass and the other expatriates wrote a letter to the Kepro board of directors regarding the expatriates' new employment agreements. (*See id.* Ex. W.) In that letter, the expatriates, including Glass, acknowledged that they had been conducting discussions regarding their agreements with management, but as of then had not been able to conclude the discussions. (*See id.* at GL 00090.) They acknowledged that a law firm was preparing a draft employment agreement that would form the basis of the agreement to be reached with each of the expatriates, and asked to see a copy of the draft agreement. (*See id.*) They acknowledged that negotiations were still ongoing, but that they hoped that they and the board could reach an agreement on employment matters soon. (*See id.* at GL 00091.)

In addition, on October 14, 1994, Oberst wrote a note to Glass and the other expatriates setting forth the "boiler-plate" drafts of the employment agreements. (*See id.* Ex. X at GL 00183.) On that note, Glass wrote a note to himself asking when the agreements would be approved by the board of directors, presumably of Kepro. (*See id.*) Similarly, also on October 14, 1994, Glass wrote a memorandum to himself asking when he and the other expatriates would receive final versions of the employment agreements; when the final agreements would be approved by the board of directors; and why they should talk to Oberst, since he had no authority unless he received a letter from the board of directors giving him authority by proxy. (*See id.* Ex. Y at GL 00202.)

Glass was fired on October 20, 1994. (*See* Plaintiff's Corrected Rule 12(N) Statement of Contested Facts in Opposition to Kemper's Motion for Summary Judgment ("Pl.'s Rule 12(N) Statement") Ex. DD.)

The October 10 letter and October 14 notes make clear that Glass knew that only the Kepro board, and not Oberst, had final authority to enter into new employment agreements with the expatriates. The letter and notes also make clear that Glass knew that no final employment agreement had been reached as of October 14, 1994. Thus, the letter and notes belie Glass's claim that he thought that Oberst had ultimate authority to enter into a binding employment agreement with him. More importantly, they belie

---

3. Because one expatriate was not satisfied with the employment terms, Oberst and his boss decided not to present the expatriates' employment terms to the Kepro board at the September 21, 1994, meeting. Consequently, the Kepro board

vote on the employment agreements did not occur, and the Kepro board did not ratify the revised employment terms for Glass or the other expatriates. (Defs.' Rule 12(M) Statement ¶ 31.)

the crux of his case, in which he essentially argues that he had a binding employment agreement as of September 1994.

Glass has failed to present evidence of any written statements by Oberst or written or oral statements by anyone else that directly contradict Oberst's written statements that Glass's employment agreement had to be approved by Kemper and the Kepro board of directors. Rather, Glass simply claims that Jack Neal, Oberst's supervisor, told Glass that Oberst had all the authority he needed to get Diagonal Mar built and that Glass should follow Oberst's management instructions; (*see id.* Ex. B ¶ 4); that Oberst told Glass that he was Kemper's designee to conduct contract negotiations; (*id.* ¶¶ 7, 9); and that Oberst told Glass that Kemper or Kepro approvals could be made by a designee and that either Oberst or Jack Neal was such a designee. (*See* Pl.'s Rule 12(N) Statement at 19 ¶ 13).

As the court has noted, Glass's own notes belie his claim that he thought that Oberst could enter into a binding employment contract with Glass. Moreover, neither Neal's statement that Oberst had all the authority he needed to get Diagonal Mar built nor Oberst's statement that he had authority to negotiate an employment agreement translates to a representation that Oberst had authority to reach a binding employment agreement without Kemper and Kepro approval. In fact, nowhere does Glass claim that Oberst or anyone else explicitly told him that Oberst could enter into a binding employment agreement with him.

Finally, even if Oberst orally stated to Glass that he had authority to bind Kemper and Kepro to an employment contract with Glass, Oberst's numerous written assertions to the contrary made any reliance by Glass on the oral statements unreasonable. *See Runnemede,* 861 F.2d at 1059; *Mason & Dixon,* 975 F.2d at 1305.

The court acknowledges Glass's contention that the elements of fraud or estoppel, including reasonable reliance, generally are questions of fact. *See, e.g., R.S. Bennett & Co., Inc. v. Economy Mechanical Indus., Inc.,* 606 F.2d 182, 186–87 (7th Cir.1979) (estoppel); *Loganberry Partners L.P. v. Al-ternative Benefits Sales, Inc.,* No. 95 C 7028, 1996 WL 296669, *4 (N.D.Ill. May 31, 1996) (citing *Jeffrey M. Goldberg & Assoc., Ltd. v. Collins Tuttle & Co.,* 264 Ill.App.3d 878, 885,, 202 Ill.Dec. 367, 372, 637 N.E.2d 1103, 1108 (1st Dist.1994)) (fraud).

■ Nonetheless, the existence of reasonable reliance can be a question of law, appropriately decided on a motion for summary judgment, where no reasonable jury could find that it was reasonable for a plaintiff to rely upon the statements of the defendant. *See Puri v. Blockbuster Music Retail, Inc.,* No. 95 C 50018, 1995 WL 756855, *5 (N.D.Ill.Dec.20, 1995) (as matter of law, any reliance on oral assertions by plaintiff was unreasonable in light of unambiguous language in lease agreement that contradicted oral assertions).

The Seventh Circuit in *Runnemede,* 861 F.2d at 1059, and *Mason & Dixon,* 975 F.2d at 1305, did not explain why it ruled as a matter of law on whether the plaintiffs had reasonably relied on the representations of the defendants. Nonetheless, the facts of those cases indicate that the court presumably found that no question of fact existed about whether the plaintiffs could prove reasonable reliance. The present case is not materially different from those cases, or from *Puri,* 1995 WL 756855, *5.

Accordingly, the court finds that no genuine issue of material fact exists regarding whether Glass reasonably relied on any representations that Oberst had authority to enter into a binding employment agreement with Glass without approval by both Kemper and the Kepro board of directors; he did not. Since Glass cannot establish an essential element of his promissory fraud, promissory estoppel, and equitable estoppel claims, the court grants summary judgment in favor of Kemper on those claims.

**2. Count I—promissory fraud claim**

In addition to its argument regarding justifiable reliance, Kemper raises an additional reason why it deserves summary judgment on Glass's promissory fraud claim. Kemper contends that Glass cannot meet the "delib-

erately high" burden of establishing the "disfavored" action of promissory fraud.

■ Promissory fraud generally is not actionable in Illinois, but an exception exists " 'where the false promise or representation of intention of future conduct is the scheme or device to accomplish the fraud.' " *Bower v. Jones,* 978 F.2d 1004, 1011 (7th Cir.1992) (quoting *Steinberg v. Chicago Medical School,* 69 Ill.2d 320, 334, 13 Ill.Dec. 699, 706, 371 N.E.2d 634, 641 (1977)). The scheme exception applies where " 'a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where the other party relies on it to his detriment.' " *Bower,* 978 F.2d at 1011 (quoting *Concord Indus., Inc. v. Harvel Indus. Corp.,* 122 Ill.App.3d 845, 849–50, 78 Ill.Dec. 898, 901, 462 N.E.2d 1252, 1255 (1st Dist.1984)).

■ However, promissory fraud is a "disfavored cause of action in Illinois because fraud is easy to allege and difficult to prove or disprove." *Bower,* 978 F.2d at 1012 (citing *Hollymatic Corp. v. Holly Systems, Inc.,* 620 F.Supp. 1366, 1369 (N.D.Ill.1985)). Thus, a plaintiff claiming promissory fraud has a "deliberately high" burden of proof. *Bower,* 978 F.2d at 1012.

> "In order to survive the pleading stage, a claimant must be able to point to *specific, objective manifestations* of fraudulent intent—a scheme or device. If he cannot, it is in effect presumed that he cannot prove facts at trial entitling him to relief. If the rule were otherwise, anyone with a breach of contract claim could open the door to tort damages by alleging that the promises were never intended to be performed. Presumably, it is this result that the Illinois rule seeks to avoid."

*Id.* (*quoting Hollymatic,* 620 F.Supp. at 1369) (emphasis added).

In all of his voluminous evidentiary submissions to the court, Glass has not pointed to any "specific, objective manifestations" of Kemper's intent to commit fraud on him. The court has found nothing in either party's submissions to the court that even hints at such a fraudulent intent on Kemper's behalf. In fact, in his deposition testimony, Glass himself stated that other than his suspicion about purported "aberrant behavior" of Oberst, he has no evidence that Oberst's representation that Glass would be given a new employment contract was part of a scheme to carry out any type of fraud on Glass. (*See* Pl.'s Rule 12(N) Statement Ex. C.)

■ Glass's speculation about Oberst's behavior is not sufficient to establish fraud by clear and convincing evidence, which is the burden that Glass bears. *See Athey Products Corp. v. Harris Bank Roselle,* 89 F.3d 430, 434–35 (7th Cir.1996) ("speculation, possibilities, and reasonable explanations for [defendant's allegedly fraudulent] conduct do not satisfy [plaintiff's] burden of showing fraud by clear and convincing evidence"). Other than speculation, Glass has not presented even a scintilla of evidence to support his promissory fraud claim.

Accordingly, the court grants summary judgment in favor of Kemper on Count I.

### 3. Count II—breach of contract

■ Kemper contends that in order to maintain a breach of contract claim against Kemper, Glass must prove that Oberst had apparent authority to bind Kemper and Kepro to a new employment contract. However, Kemper argues, because Glass knew that any new employment terms required both Kemper and Kepro approval, Glass knew that Oberst had no authority to bind Kemper and Kepro to a new employment contract.

■ An agent can bind his principal through the existence of apparent authority. *Mason & Dixon,* 975 F.2d at 1303 (citing *Bank of North Carolina, N.A. v. Rock Island Bank,* 630 F.2d 1243, 1251 (7th Cir.1980)). " ' "Apparent authority arises when a principal creates, by its words or conduct, the reasonable impression in a third party that the agent has the authority to perform a certain act on its behalf." ' " *Mason & Dixon,* 975 F.2d at 1303 (quoting *Bank of North Carolina,* 630 F.2d at 1251 (quoting *Crawford Savings & Loan Ass'n v. Dvorak,* 40 Ill.App.3d 288, 292, 352 N.E.2d 261, 264 (1st Dist.1976))).

In *Mason & Dixon,* the plaintiffs brought suit against defendants for, among other

things, breach of an oral agreement to settle a previous lawsuit brought by the defendant union pension fund to impose withdrawal liability on the plaintiffs. *Mason & Dixon*, 975 F.2d at 1300. The plaintiffs contended that one of the trustees of the pension fund several times had represented that he had the authority to settle the case, that they had reached a settlement with the trustee, and that the trustee had stated that the settlement was a "done deal." *Id.* at 1302, 1303–04.

The district court found the trustee's statements irrelevant because it found that the plaintiffs knew that the trustee lacked authority to settle the case. The district court based its finding on a letter the trustee had written to the plaintiffs stating that any settlement would have to be approved by the other trustees of the pension fund. The trustee had written this letter prior to the date on which the plaintiffs claimed they had reached an oral settlement agreement with the trustee. *Id.* at 1304. Thus, the district court granted summary judgment in favor of defendants on the breach of oral agreement claim. Plaintiffs appealed. *Id.* at 1300.

The court of appeals affirmed, finding the trustee without apparent authority to settle the litigation. According to the court, the fundamental problem with plaintiffs' argument was that long before the alleged oral settlement agreement was reached, the trustee made clear in writing that there could be no settlement agreement until the other trustees approved any settlement agreement. Consequently, subsequent to that letter, the plaintiffs could not reasonably rely on the trustee's oral assurances that he could agree to a settlement, since they had a clear written statement by him to the contrary. The court thus held that the plaintiffs had notice that the trustee lacked authority to agree to a settlement on behalf of the other trustees, and that the district court correctly granted summary judgment in favor of defendants on the oral contract claim. *Id.* at 1304–05.

Glass's breach of contract claim is factually analogous to the oral contract claim in *Mason & Dixon*. Even if Oberst made oral representations to Glass that he had authority to enter into a binding employment contract with Glass, from the beginning of negotiations with Glass, he repeatedly stated in writing that any new employment terms would have to be approved by Kemper and the Kepro board of directors. (*See* Section II.D.1. above.) Thus, Glass had clear written notice that Oberst lacked the authority to agree to new employment terms without approval by Kemper and the Kepro board, and it would have been unreasonable for Glass to rely on oral representations to the contrary.

Because Oberst did not have apparent authority to enter into a new employment contract with Glass, and Kemper and Kepro did not approve a new employment agreement with Glass, there was no contract for Kemper to breach. Accordingly, the court grants summary judgment in favor of Kemper on the breach of contract claim.

### E.  *Effect on Prime defendants of summary judgment in favor of Kemper*

As the court previously noted, the Prime defendants' liability is derivative of Kemper's liability, since the Prime defendants' liability rests on being joint venture partners with Kemper. Thus, though the Prime defendants' own motion did not warrant the court's granting summary judgment in their favor, Kemper's motion does.

Accordingly, because the court grants summary judgment in favor of Kemper, it also grants summary judgment in favor of the Prime defendants.

### III.  *CONCLUSION*

For the foregoing reasons, the court strikes defendant Michael Oberst's motion for summary judgment as moot, and grants the motions for summary judgment of defendants Prime Group, Inc., Prime International, Inc., and Kemper Corporation. The court enters summary judgment on Counts I, II, III, and IV against plaintiff Gregory Glass and in favor of defendants Prime Group, Inc., Prime International, Inc., and Kemper Corporation.